BRENT NEWELL, CA Bar No. 210,312
MADELINE STANO, CA Bar No.  289,660
CENTER ON RACE, POVERTY & THE ENVIRONMENT
47 Kearny Street, Suite 804
San Francisco, CA 94108
Telephone:     (415) 346-4179
Fax:            (415) 346-8723
Email:         bnewell@crpe-ej.org
               mstano@crpe-ej.org

MICHAEL MEUTER, CA Bar No. 161,554
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
Migrant Farmworker Project
3 Williams Road
Salinas, CA 93905
Telephone:     (831) 757-5221
Facsimile:     (831) 757-6212
Email:         mmeuter@crla.org

[Additional Counsel Listed on Signature Page]

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARIA GARCIA, DAVID GARCIA, and ANGELICA GUZMAN,<br><br>                   Plaintiffs,<br><br>       v.<br><br>GINA MCCARTHY, in her official capacity as Administrator of the U.S. Environmental Protection Agency, *et al*.<br><br>                   Defendants. | Case No. 3:13-cv-03939 WHO<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT**<br><br><br>Date:      **January 8, 2014**<br>Time:      **2:00 pm**<br>Location:  **Courtroom 2** |

1

**TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES…………………………………………………………ii

3   I.      INTRODUCTION…………………………………………………………1

4   II.     STANDARD REVIEW……………………………………………………2

5   III.    STATUTORY AND REGULATORY BACKGROUND……………………3

6   IV.     STATEMENT OF FACTS…………………………………………………5

7   ARGUMENT……………………………………………………………………...10

8
    V.      THE COURT SHOULD REVIEW EPA'S ACTIONS UNDER THE
9           ADMINISTRATIVE PROCEDURE ACT……………………………………10

10          A.      Title VI and EPA's Regulations Rebut the Chaney Presumption……………11

11          B.      Section 603 of the Civil Rights Act Permits Judicial Review………………13

12          C.      There are no other Adequate Remedies at Law……………………………...16

13  VI.     EPA DEPRIVED GARCIA OF PROPERTY WITHOUT DUE PROCESS………..19

14          A.      EPA Directly and Adversely Affected Garcia's Property Interests…………20

15          B.      Garcia has a Property Interest in a Right to Redress…………………….......21

16          C.      Title VI Requires EPA to Prevent Racial Discrimination…………………...23

17  VII.    CONCLUSION……………………………………………………………25

18

19

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF AUTHORITIES**

<u>CASES</u>

3

*Adams v. Richardson,* 480 F.2d 1159 (D.C. Cir. 1973) ...............................................12

4

*Alexander v. Sandoval,* 532 U.S. 275 (2001) ............................................... *passim*

5

6

*Association of Irritated Residents v. EPA*
   494 F.3d 1027 (D.C. Cir. 2007) ...........................................................11

7

*Balistreri v. Pacifica Police Dept.,* 901 F.2d 696 (9th Cir. 1990) ...........................................3

8

*Bowen v. Massachusetts,* 487 U.S. 879 (1988) ........................................11, 17, 18

9

10

*Brem-Air Disposal v. Cohen,* 156 F.3d 1002 (9th Cir. 1998) .................................17

11

*Butt v. State of California,* 4 Cal.4th 668 (1992) ....................................................23

12

13

*Carson Harbor Village, Ltd. v. City of Carson*
   353 F.3d 824 (9th Cir. 2004) .......................................................................2

14

15

*Citizens to Preserve Overton Park v. Volpe*
   401 U.S. 402 (1971) ...............................................................................11

16

*Coker v. Sullivan,* 902 F.2d 84 (D.C. Cir. 1990) .....................................................17

17

18

*Connecticut National Bank v. Germain*
   503 U.S. 249 (1992) .........................................................................14, 15

19

*DeShaney v. Winnebago County Department of Social Services*
   489 U.S. 189 (1989) ...............................................................................25

20

21

*Evans v. Jeff D.,* 475 U.S. 717 (1986) ......................................................................1

22

*Friends of the Earth v. Laidlaw,* 528 U.S. 167 (2000) ..........................................19

23

*Fuentes v. Shevin,* 407 U.S. 67 (1972) ...................................................................24

24

*Goss v. Lopez,* 419 U.S. 565 (1975) ..................................................................23, 24

25

26

*Greater Los Angeles Council on Deafness, Inc. v. Baldridge*
   827 F.2d 1353 (9th Cir. 1987) ...............................................................11

27

*Heckler v. Chaney,* 470 U.S. 821 (1985) ................................................. *passim*

28

*Jacobs Farm/Del Cabo, Inc. v. Western Farm Service Inc.,*

190 Cal.App.4th 1502 (Cal. Ct. App. 2010) ......................................................18

*Kang v. U. Lim Am., Inc.,* 296 F.3d 810 (9th Cir. 2002) ...................................14

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) .................................................3

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ..................................15, 19

*Marlow v. U.S. Department of Education.* 820 F.2d 581 (1987) .........................14

*NAACP v. The Medical Center, Inc.,* 599 F.2d 1247 (3d Cir. 1979) ..............13, 16

*O'Bannon v. Town Court Nursing Center*
    447 U.S. 773 (1980) ......................................................................................20

*Rosemere Neighborhood Association v. EPA*
    581 F.3d 1169 (9th Cir. 2009) ................................................................1, 6, 7

*Rubin v. United States*, 449 U.S. 424 (1981) .....................................................14

*Serrano v. Priest,* 5 Cal.3d 584 (1971) ...............................................................23

*Sierra Club v. Whitman*, 268 F.3d 898 (9th Cir. 2001) .......................................13

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ....................................18

*Town of Castle Rock v. Gonzales,* 545 U.S. 748 (2005) ......................................22

*Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205 (1972) .........................15

*Turtle Island Restoration Network v. United States Department of State*
    673 F.3d 914 (9th Cir. 2012) .......................................................................19

*Tucson Airport Authority v. General Dynamics Corporation*
    136 F.3d 641 (9th Cir. 1998) .......................................................................18

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) .........................................2

1

# FEDERAL STATUTES AND REGULATIONS

2

United States Code

3  5 U.S.C. § 701 ..........................................................................................14, 16

4  5 U.S.C. § 704 ..........................................................................................16, 17

5
   42 U.S.C. § 2000d .................................................................................. *passim*
6
   42 U.S.C. § 2000d-1 .............................................................................. *passim*
7
   42 U.S.C. § 2000d-2 ................................................................5, 10, 14, 15
8

9

10 Code of Federal Regulations

11 40 C.F.R. § 7.30 ...............................................................................................4

12 40 C.F.R. § 7.35 .........................................................................................4, 17

13
   40 C.F.R. § 7.35(b) ............................................................................... *passim*
14
15 40 C.F.R. § 7.115 .......................................................................................4, 13

16 40 C.F.R. § 7.115(c) ..................................................................................4, 16

17 40 C.F.R. § 7.115(c)(1) .............................................................................7, 22

18 40 C.F.R. § 7.115(c)(1)(ii) .........................................................................8, 12

19 40 C.F.R. § 7.115(d) ............................................................................5, 12, 16

20
   40 C.F.R. § 7.115(d)(2) ....................................................................................5
21
22 40 C.F.R. § 7.115(e) ....................................................................5, 12, 16, 23

23 40 C.F.R. § 7.115(f) .............................................................................5, 12, 16

24 40 C.F.R. § 7.120 .......................................................................................4, 22

25 40 C.F.R. § 7.120(c) ........................................................................................4

26 40 C.F.R. § 7.120(d) .......................................................................................4

27
   40 C.F.R. § 7.120(d)(1)(i) ...............................................................................4
28

**PLAINTIFFS' OPPOSITION TO MOTION**
**TO DISMISS AMENDED COMPLAINT**

**CASE NO. 3:13-CV-03939 WHO**

40 C.F.R. § 7.120(d)(1)(ii) ...................................................................4

40 C.F.R. § 7.120(d)(1)(iii) ..................................................................4

40 C.F.R. § 7.120(g) .........................................................................22

40 C.F.R. § 7.130(a) .....................................................................12, 22

40 C.F.R. § 7.130 (b). ...................................................................12, 23


Federal Rules of Civil Procedure

Fed. R. Civ. P. 12(b)(1) ...................................................................2, 6

Fed. R. Civ. P. 12(b)(6) ...................................................................2, 6

Fed. R. Civ. P. 15(a)(1)(B) .................................................................6

1   **I.     INTRODUCTION.**

2          A right without a remedy is no right at all.  President Kennedy, President Johnson,

3   and Congressional leaders responded to racial injustice throughout the United States with

4   Title VI of the Civil Rights Act of 1964 as the Civil Rights Movement gained undeniable

5   momentum.  Title VI and EPA's implementing regulations deliver an unconditional promise:

6   no person shall suffer intentional racial discrimination or unintentional discriminatory effects

7   from any program or activity receiving federal financial assistance.  Almost 40 years after

8   President Johnson signed the Civil Rights Act, Defendants U.S. Environmental Protection

9   Agency, *et al*. (collectively "EPA") remain mired in their own incapacity and unwillingness

10  to effectuate the letter and spirit of Title VI, as thoroughly documented by the Deloitte

11  Report and soundly criticized by the Ninth Circuit Court of Appeals in *Rosemere*

12  *Neighborhood Association v. EPA*, 581 F.3d 1169 (9th Cir. 2009).

13         "Ultimately, enforcement of the law is what really counts."  *Evans v. Jeff D.*, 475 U.S.

14  717, 743 (1986) (Brennan, J. dissenting).  EPA's failure to enforce Title VI closes the door

15  on those suffering discriminatory effects from environmental conditions – like harmful and

16  disparate pesticide exposures to Latino schoolchildren – because the Supreme Court held in

17  *Alexander v. Sandoval*, 532 U.S. 275 (2001), that such victims of discrimination have no

18  private right of action to enforce the discriminatory effects prohibition.  Without the ability to

19  secure a remedy in an action directly against the California Department of Pesticide

20  Regulation, Plaintiffs Maria Garcia, David Garcia, and Angelica Guzman (collectively

21  "Garcia") can only file an administrative complaint with EPA in order to remedy such

22  discrimination.  Because EPA either unwillingly or incapably failed to enforce the law,

23  Garcia obtained no remedies for their violated rights.

24         In this case, Garcia seeks judicial review of EPA's investigation, settlement, and

25  dismissal of their administrative Title VI complaint under the Administrative Procedure Act.

26  EPA's actions in *Angelita C. v. California Department of Pesticide Regulation* directly

27  jeopardize the health, safety, and ability of Garcia's children, as well as other Latino children

28  attending California schools, because EPA found that the allowed use of methyl bromide, a

PLAINTIFF'S OPPOSITION TO MOTION                                    CASE NO. 3:13-CV-03939 WHO
TO DISMISS AMENDED COMPLAINT

1    highly toxic fumigant, inflicted discriminatory and adverse effects on Latino children from

2    1995 to 2001.  EPA refused to consider other pesticides replacing methyl bromide or harm

3    inflicted after 2001, and settled *Angelita C.* without requiring any protections to ensure

4    methyl bromide or other pesticides would not cause discriminatory effects.  In addition to

5    arbitrary and capricious action under the APA, EPA's action deprived Garcia of their right to

6    redress discrimination and right to a public education without adequate procedural

7    protections in violation of the due process clause of the Fifth Amendment.

8        EPA now seeks dismissal of Garcia's claims.  The Court should deny the Motion

9    because Title VI and EPA's regulations provide law to apply and rebut the *Heckler v. Chaney*

10    presumption of nonreviewability, section 603 of the Civil Rights Act specifically provides

11    for judicial review here, and because the state administrative remedy EPA suggests does not

12    displace judicial review under the APA.  The Court should also deny the Motion because

13    victims of discrimination are direct beneficiaries of the Title VI scheme, Garcia has property

14    interests in a right to redress and a right to public education, and EPA has a duty to remedy

15    discrimination.[1]

16   **II.**   **STANDARD OF REVIEW.**

17        In considering this Motion to Dismiss under FED. R. CIV. P. 12(b)(1), the Court

18    accepts all factual allegations in the complaint as true.  *Carson Harbor Village, Ltd. v. City of*

19    *Carson*, 353 F.3d 824, 826 (9th Cir. 2004).  In a 12(b)(1) motion, the Court may consider the

20    documents referenced in the Complaint without converting EPA's motion to dismiss into a

21    motion for summary judgment.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.

22    2003).

23        Dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) is

24    appropriate only if plaintiffs can prove no set of facts in support of their claims that would

25    entitle them to relief.  *Guerrero v. Gates*, 357 F.3d 911, 916 (9th Cir. 2004).  A court may

26

27

28

---

[1] EPA disputes the Third Claim for Relief, which duplicates the prayer for injunctive relief. EPA Br. at 18; Complaint ¶¶ 103-106, Prayer for Relief ¶¶ B, D.  Garcia does not seek injunctive relief for any claims other than the APA claim and the denial of procedural due process claim.

dismiss a complaint for "lack of a cognizable legal theory, or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). The Court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party. *Guerrero*, 357 F.3d at 916. In so doing, the Court may consider facts alleged on the face of the complaint, in documents attached to the complaint, and documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (brackets in original). Garcia provides the Court with several documents so referenced as Exhibits to the Declaration of Brent Newell in Support of Plaintiffs' Opposition to Motion to Dismiss Amended Complaint ("Newell Decl.").

## III. STATUTORY AND REGULATORY BACKGROUND.

Title VI of the Civil Rights Act protects individuals from racial discrimination by institutions that utilize federal funds. 42 U.S.C. § 2000d. Section 601 mandates that "[N]o person shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id*.

Section 602 authorizes and directs each federal agency that provides federal financial assistance to any program or activity "to effectuate the provisions of section 601 with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U.S.C. § 2000d-1. Congress authorized agencies to ensure compliance with any requirement promulgated pursuant to section 602 by terminating federal funding or "by any other means authorized by law." *Id*. Congress limited agencies' enforcement authority by mandating that "no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." *Id*.

Pursuant to Section 602, the EPA promulgated regulations prohibiting EPA funding recipients from engaging in racial discrimination. *See* 40 C.F.R. §§ 7.30 and 7.35. The regulations expressly prohibit programs or activities that have a discriminatory effect.

> A recipient shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity with respect to individuals of a particular race, color, national origin, or sex.

40 C.F.R. § 7.35(b).

The EPA, through the Office of Civil Rights ("OCR"), is responsible for investigating complaints against EPA funding recipients. 40 C.F.R. §§ 7.115 and 7.120.[2] Once a complainant files a complaint with EPA, the OCR has five (5) calendar days to notify the complainant and the recipient of the OCR's receipt of the complaint. 40 C.F.R. § 7.120(c). After acknowledging receipt of a complaint, the OCR must immediately initiate complaint processing procedures. 40 C.F.R. § 7.120(d). Within twenty (20) days after the OCR acknowledges the complaint, the OCR will review the complaint for acceptance, rejection, or referral to the appropriate Federal agency. 40 C.F.R. § 7.120(d)(1)(i). OCR "shall promptly investigate *all* complaints" filed with OCR. 40 C.F.R. § 7.120.

If the complaint is accepted, the OCR will notify the complainant, the EPA Award Official, and the recipient of federal financial assistance. 40 C.F.R. § 7.120(d)(1)(ii). The recipient then has the opportunity within thirty (30) days to submit a response to the OCR addressing the allegations in the complaint. 40 C.F.R. § 7.120(d)(1)(iii). Within 180 days of the start of the complaint investigation, OCR will notify the recipient in writing by certified mail, return receipt requested, of preliminary findings, recommendations for voluntary compliance, and the recipient's right to engage in voluntary compliance negotiations where appropriate. *Id.* at § 7.115(c).

---

[2] EPA misleadingly infers that sections 7.115 and 7.120 do not permit Title VI complainants from participating in settlement negotiations. EPA Br. at 3:9-10. Those regulations neither mandate nor exclude complainants from such negotiations.

1   After receiving the notice of OCR's preliminary finding of noncompliance, the

2   recipient may (1) agree to the OCR's recommendations; or (2) submit a written response

3   sufficient to demonstrate that the preliminary findings are incorrect, or that the recipient may

4   achieve compliance through steps other than those recommended by OCR.  40 C.F.R. §

5   7.115(d).  If the recipient does not take one of these actions within fifty (50) calendar days

6   after receiving this preliminary notice, the OCR shall, within fourteen (14) calendar days,

7   send a formal written determination of noncompliance to the recipient and copies to the

8   award official and the Attorney General.  40 C.F.R. § 7.115(d)(2).  If the recipient does not

9   come into voluntary compliance within ten (10) days after the formal written determination

10  of noncompliance, then EPA shall initiate proceedings to secure compliance.  40 C.F.R. §

11  7.115(e).  "All agreements to come into voluntary compliance" must be in writing and must

12  "set forth the specific steps the recipient has agreed to take."  40 C.F.R. 7.115(f).

13  Section 603 provides for judicial review of agency actions.  Any action taken

14  pursuant to section 602 is subject to judicial review as provided by law. 42 U.S.C. § 2000d-2.

15  Section 602 further allows that "any person aggrieved may obtain judicial review" of an

16  agency action "to continue financial assistance upon a finding of failure to comply with any

17  requirement imposed pursuant to section 602[.]"  42 U.S.C. § 2000d-2.

18  **IV.    STATEMENT OF FACTS.**

19  On June 30, 1999, Plaintiff Maria Garcia, on behalf of herself and her then minor son

20  Plaintiff David Garcia, filed an administrative Title VI complaint with EPA, joined by

21  several other Latino parents, alleging that the California Department of Pesticide Regulation

22  ("CDPR") violated Title VI by subjecting Latino schoolchildren in California to harmful and

23  discriminatory exposures to toxic pesticides and soil fumigants, including methyl bromide.[3]

24  First Amended Complaint ("Complaint") ¶ 2 (citing *Angelita C. v. California Department of*

25

26

27  _____

[3] Exposure to the fumigant methyl bromide inflicts serious health impacts, especially to

28  children.  Complaint ¶ 42.

*Pesticide Regulation*, EPA File No. 16R-99-R9, attached as Exh. 1 to the Newell Decl.).[4]

"To demonstrate this disproportionate impact, this complaint focuses on methyl bromide, due to its particularly deadly characteristics, as an example of overall use of and exposure to highly toxic pesticides in the state." *Angelita C.* Complaint at 2

   David Garcia was fourteen years old when *Angelita C.* was filed in 1999 and a student at Rio Mesa High School in Oxnard, California.  David Garcia now has two children, one and three years old that live in Oxnard in the Rio School District and Oxnard Union School District and will attend Rio Lindo Elementary School, Rio del Valle Middle School, and Rio Mesa High School.  Complaint ¶ 21.  Plaintiff  Angelica Guzman is Maria Garcia's daughter and her children live in the Rio School District and Oxnard Union School District, attend Rio Lindo Elementary School, and will attend Rio del Valle Middle School and Rio Mesa High School in Oxnard, California.  Complaint ¶ 22.

   On December 11, 2001, 895 days after the complainants filed *Angelita C.*, EPA accepted the complaint for investigation.  Complaint ¶ 43.

   Almost eight years later on September 17, 2009, the Ninth Circuit Court of Appeals decided *Rosemere Neighborhood Association v. EPA*, holding that EPA's dismissal of a Title VI complaint after the complainants filed a lawsuit to compel EPA action did not moot the lawsuit.  581 F.3d 1169, 1175 (9th Cir. 2009).  The Ninth Circuit referred to the fact that EPA failed to process a single Title VI complaint from 2006 and 2007 in accordance with its regulatory deadlines and that EPA's handling of Title VI complaints demonstrated "a consistent pattern of delay." *Id.*

   On March 21, 2011, Deloitte Consulting, LLP released the EVALUATION OF THE EPA OFFICE OF CIVIL RIGHTS (hereafter "Deloitte Report").  Complaint ¶ 72; Deloitte Report,

---

[4] EPA complains that Garcia filed the First Amended Complaint more than 21 days after service of the initial complaint and did not seek leave to amend.  EPA Br. at 2 n.1.  However, Garcia appropriately filed the Amended Complaint as a matter of course prior to EPA filing this Motion to Dismiss under Rule 12(b)(1) and (6).  FED. R. CIV. P. 15(a)(1)(B) specifically allows an amended pleading filed prior to 21 days *after* service of a responsive pleading, including Rule 12(b) motions.  Accordingly, Garcia timely and appropriately filed the Amended Complaint.

1  attached as Exh. 2 to the Newell Decl.  Among other findings and consistent with *Rosemere*,

2  the Deloitte Report found that OCR had not adequately adjudicated Title VI Complaints.

3  Complaint ¶ 72; Deloitte Report at 1-2.  The Report further found that delays in accepting

4  and investigating complaints are the result of (1) the complexity in determining whether a

5  complaint falls within EPA's jurisdiction; (2) a lack of EPA methods to conduct needed

6  analyses; (3) a lack of standard operating procedures; and (4) a lack of supporting resources

7  from EPA program and regional staff who have no incentive to prioritize Title VI

8  investigations above their own program and region-related work.  *Id.*

9         On April 22, 2011 and just one month after the Deloitte Report and over nine years

10  since EPA accepted the *Angelita C.* complaint, EPA secretly issued its Investigation Report

11  and the preliminary finding of discrimination.  Complaint ¶ 46.[5]  The preliminary finding

12  should have been issued within 180 days after EPA accepted the complaint on December 11,

13  2001.  *See* 40 C.F.R. § 7.115(c)(1); Complaint ¶ 3.

14         EPA's investigation examined the estimated number and demographic compositions

15  of children from each school listed in the original complaint and compared those with the

16  "comparison group" of majority non-Latino schools in California.  Complaint ¶ 48; *see also*

17  Exposure Assessment and Disparity Analysis for Administrative Complaint 16R-99-R9

18  ("Investigation Report"), attached as Exh. 3 to the Newell Decl.  The EPA's model evaluated

19  data from over 8,000 California public schools.  Complaint ¶ 48.  EPA compared health-

20  based concentration thresholds derived by EPA's Office of Pesticide Programs in

21  conjunction with its predicted concentration levels of methyl bromide derived from CDPR's

22  Pesticide Usage Reports near schools in order to identify which, if any, had unhealthy

23  exposures from the soil fumigant methyl bromide.  *Id.*  EPA did not analyze pesticide or

24

25  _____

26  [5] EPA attempts to deflect the secretive manner in which EPA withheld the Preliminary
   Finding, the Investigation Report, and other *Angelita C.* documents from Garcia and the other
   complainants by claiming they are publicly available on EPA's website.  EPA Br. at 3 n.2.

27  EPA fails to demonstrate or even argue that the Preliminary Finding or Investigation Report
   were publicly available between April and August 2011 and before EPA notified counsel for

28  Garcia.

1  fumigant exposures after 2001 or the disparate adverse impacts from any pesticides or

2  fumigants other than methyl bromide.  Complaint ¶ 47.

3      The Investigation Report found that Rio Mesa High School exceeded all twelve

4  exposure scenarios by which EPA measured exceedances beyond federally established

5  health-based standards.  Complaint ¶ 24.  The Report also found that Rio Lindo Elementary

6  School and Rio Del Valle Middle School exceeded the standards for both intermediate-term

7  and long-term exposures.  Complaint ¶ 27.

8      EPA found that there was "sufficient evidence to make a preliminary finding of a

9  *prima facie* violation of Title VI as a result of the adverse disparate impact upon Latino

10  schoolchildren in California from the application of methyl bromide between 1995 and

11  2001."  Complaint ¶ 47 (quoting Preliminary Finding at 3, attached as Exh. 4 to the Newell

12  Decl.).  EPA found that Latino schoolchildren were disparately exposed to both short-term

13  acute (2-30 day period) and long-term chronic (180 days to lifetime) levels of methyl

14  bromide above EPA's health thresholds of concern.  Complaint ¶ 49; *see also* Preliminary

15  Finding at 3.

16      As required by its Title VI implementing regulations, EPA provided

17  recommendations for CDPR to achieve voluntary compliance with Title VI.  Complaint ¶ 50;

18  40 C.F.R. 7.115(c)(1)(ii).  EPA did not invite complainants to participate in voluntary

19  compliance negotiations or to view any underlying investigative documents.  Complaint ¶¶

20  52-53.  Although EPA "committed to working in partnership with CDPR to reach resolution"

21  of issues listed in the original Title VI complaint and its corresponding investigation, EPA

22  also requested complete secrecy:  "OCR would like to conduct these discussions

23  confidentially and hopes that CDPR will also view them in the same way."  Preliminary

24  Finding at 5.

25      On August 24, 2011, EPA and CDPR executed a voluntary compliance agreement

26  ("settlement agreement").  Complaint ¶ 54.  The *Angelita C.* complainants were not parties to

27  the settlement.  *Id.*   The settlement does not limit or alter the current registration or the use

28  of methyl bromide, its replacements, or other hazardous pesticides near majority Latino

1   public schools in California.  Complaint ¶ 55.  The settlement only required CDPR to (1)

2   continue pesticide ambient air monitoring in Salinas through 2013; (2) request the California

3   Air Resources Board (ARB) to continue methyl bromide monitoring in Oxnard and Santa

4   Maria, which had been set to expire during 2011, for an additional two years through 2013;

5   (3) request ARB to conduct monitoring in the Watsonville area in township 12S 2E; (4)

6   submit an annual report of monitoring results to EPA and environmental justice and air

7   monitoring listserves; and (4) continue its education and outreach efforts to "the Latino

8   community" by providing three outreach events a year, distributing written materials related

9   to pesticide exposure, and paying for one public service announcement on Spanish-language

10  radio stations, all within each of the five counties with the highest methyl bromide levels.

11  Complaint ¶ 56; *see also* Agreement between the California Department of Pesticide

12  Regulation and the United States Environmental Protection Agency ¶¶ 15-16, dated August

13  24, 2011, attached as Exhibit 1 to the Notice of Motion and Motion to Dismiss Amended

14  Complaint (Doc. 20-1).

15        On August 24, 2012, EPA finally informed the *Angelita C.* complainants of the

16  Preliminary Finding, the settlement agreement, and EPA's dismissal of *Angelita C.*

17  Complaint ¶ 59.  Over the next eight months, counsel for Garcia met with then EPA

18  Administrator Lisa P. Jackson and California Environmental Protection Agency Secretary

19  Matthew Rodriquez in an effort to re-open the settlement agreement to include the

20  complainants.  Complaint ¶¶ 61-67.  Even though Secretary Rodriquez was "willing to

21  participate in discussions of potential modifications to the settlement" and discuss improving

22  the credibility of the Title VI complaint resolution process, EPA ultimately refused.

23  Complaint ¶¶ 66-67.

24        Between 1999 when Garcia filed *Angelita C.* and the present, the implementation of

25  the international Montreal Protocol on Substances that Deplete the Ozone Layer began to

26  have an effect on the types of fumigants used as soil treatments.  Complaint ¶ 76.  Strawberry

27  production has qualified for Critical Use Exemptions every year, but the amount of methyl

28  bromide available to strawberry growers has declined substantially over time.  Complaint ¶

77.  In place of methyl bromide, growers have been utilizing other available fumigants, in particular chloropicrin, 1,3-dichloropropene (*aka* "Telone"), and metam salts.[6]  *Id*.  The overall mix of soil fumigants in California has changed over time, but overall use has not declined substantially.  *Id*; *see also* Complaint Figure 1 at 18.

Compared to the rest of California, Rio Mesa High School, Rio del Valle Middle School, and Rio Lindo Elementary are also among the top 10% of zip code areas in California with the highest environmental pollution, with pesticides contributing 99.9% of the pollutants.  Complaint ¶ 78; *see also* Complaint Figure 5 at 21.  An evaluations of soil fumigant use in the area near Rio Mesa High School indicates that use of these toxic chemicals is still very high, with six of the twelve 1x1 mile sections near the school and the section containing Rio Mesa High School in the 90th percentile of fumigant use in the state of California overall.  Complaint ¶ 79; *see also* Complaint Figure 2 at 19.  Similar to statewide soil fumigant use, the overall mix of soil fumigants in the Rio Mesa High School area has changed over time, but overall use has not declined substantially.  Complaint ¶ 79; *see also* Complaint Figure 3 at 19.

## ARGUMENT

## V.  THE COURT SHOULD REVIEW EPA'S ACTIONS UNDER THE ADMINISTRATIVE PROCEDURE ACT.

Garcia challenges EPA's action to investigate, settle, and then dismiss the *Angelita C.* complaint under the APA as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.  Complaint ¶¶ 87-88.  EPA incorrectly argues that EPA's action is unreviewable enforcement discretion under *Heckler v. Chaney*, 470 U.S. 821 (1985), because Title VI and EPA's implementing regulations limit enforcement discretion and rebut the *Chaney* presumption.  Furthermore, and regardless of *Chaney*, section 603 of the Civil Rights Act, 42 U.S.C. § 2000d-2, specifically allows for judicial review given EPA's finding

---

[6] Chloropicrin, Telone and metam salts are all known carcinogens with documented health impacts.  Complaint ¶¶ 81-83.

1  of discrimination and decision to continue funding CDPR without protecting Garcia and

2  other similarly situated parents and children.

3      EPA also overreaches when it contends that California state law provides adequate

4  remedies which preclude judicial review.  Rather, Congress must provide such parallel

5  remedies to preclude review under the APA.  *Bowen v. Massachusetts*, 487 U.S. 879, 903

6  (1988).  The suggested state remedies are nevertheless inadequate because Garcia could not

7  obtain the same remedies available under the APA and must challenge multiple permits to

8  apply restricted use pesticides every year their children attend Rio Lindo, Rio del Valle, and

9  Rio Mesa schools.  The Court should not condone such burdens on Garcia to protect their

10  children when Congress gave EPA that responsibility.

11      **A.      Title VI and EPA's Regulations Rebut the *Chaney* Presumption.**

12       EPA insists that enforcement of Title VI is committed to its unreviewable discretion.

13  EPA Br. 5-9.  But the agency discretion exception to the general rule that agency action is

14  reviewable is narrow and only "applicable in those rare instances where 'statutes are drawn

15  in such broad terms that in a given case there is no law to apply.'  S. Rep. No. 752, 79th

16  Cong., 1st Sess., 26 (1945)."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410

17  (1971).  In *Chaney*, the Supreme Court held that an agency's decision not to enforce the law

18  is presumed immune from judicial review under section 701(a)(2) of the APA.  *Chaney*, 470

19  U.S. at 831 (citing four Supreme Court prosecutorial discretion decisions).  Likewise, courts

20  have extended *Chaney* to an agency decision to execute an administrative settlement

21  agreement.  *See*, *e.g.*, *Association of Irritated Residents v. EPA*, 494 F.3d 1027, 1032-1033

22  (D.C. Cir. 2007).  A plaintiff may, however, rebut the *Chaney* presumption when the

23  substantive statute or an agency's regulations provide law for the Court to apply.  *Chaney*,

24  470 U.S. at 832-833; *Greater Los Angeles Council on Deafness, Inc. v. Baldridge*, 827 F.2d

25  1353, 1361 (9th Cir. 1987) (*en banc*) (regulations provide law to apply to rebut *Chaney*

26  presumption)).

27      The text and structure of Title VI, as well as EPA's regulations, provide ample law

28  that rebuts the *Chaney* presumption.  Section 601 mandates that no person shall suffer racial

1  discrimination by a recipient of federal financial assistance.  42 U.S.C. § 2000d.  EPA's

2  regulations specifically prohibit a recipient of federal financial assistance from using "criteria

3  or methods of administering its program or activity which have the effect of subjecting

4  individuals to discrimination because of their race, color, national origin, or sex[.]"  40

5  C.F.R. § 7.35(b).  These provisions limit EPA's enforcement discretion to continue funding

6  CDPR after finding methyl bromide use inflicted disparate adverse effects and ignoring the

7  discriminatory effects of the fumigants replacing methyl bromide.  Complaint ¶¶ 87-88.  In

8  other words, EPA lacks discretion to allow the discrimination to continue.

9       Section 602 expressly requires EPA to attempt to secure compliance through

10  voluntary means before imposing the expansive remedial scheme, which includes suspension

11  of funding or any other means to achieve compliance authorized by law.  42 U.S.C. § 2000d-

12  1.  EPA's implementing regulations accordingly require EPA to first secure compliance

13  using "voluntary compliance agreements" before mandating the other remedies.  40 C.F.R.

14  §§ 7.115(c)(1)(ii), (d), (e) and (f); 40 C.F.R. §§ 7.130(a), (b).  Section 602 and 40 C.F.R. §

15  7.115 together limit EPA's enforcement discretion by requiring EPA to actually ensure

16  compliance with Title VI in a voluntary compliance agreement before resorting to the other

17  remedies required in 40 C.F.R. § 7.130(a) and (b).  *See Adams v. Richardson*, 480 F.2d 1159,

18  1161-1163 (D.C. Cir. 1973) (*en banc*) (pre-*Chaney* decision holding that Title VI requires

19  agency enforcement, provides specific enforcement procedures, and that prosecutorial

20  discretion did not bar review of the agency's funding of noncompliant schools).  The Court

21  may thus use the limiting framework of Title VI and EPA's regulations to review EPA's

22  investigation and settlement to determine whether EPA acted arbitrarily, capriciously, or not

23  in accordance with the law when EPA investigated, settled, and dismissed the *Angelita C.*

24  complaint.

25       None of the four arguments EPA offers should justify insulating EPA's conduct from

26  judicial review.  *See* EPA Br. at 7-9.  EPA argues that neither Title VI nor the regulations

27  eliminate EPA discretion to focus solely on "methyl bromide exposure from 1995-2001."

28

1   EPA Br. at 7:15-17.  EPA alternatively argues[7] that "there is no language in [40 C.F.R.] §

2   7.115" that requires "substantive compliance with Title VI," citing only *Sierra Club v.*

3   *Whitman*, 268 F.3d 898 (9th Cir. 2001).  EPA Br. at 8 n.5.  The former does nothing more

4   than make the conclusory statement that Title VI does not confine EPA's discretion.  With

5   regard to the latter, *Sierra Club* is inapposite because it held that the Clean Water Act's

6   language and Congressional intent enacting the Clean Water Act's enforcement structure did

7   not limit EPA's enforcement discretion.  *Sierra Club*, 268 F.3d at 904-905.  EPA cites to no

8   authority that would allow EPA discretion to dilute the Title VI discrimination prohibition.

9           The Court should also reject EPA's remaining two arguments, which contend that

10  Title VI does not require EPA to include complainants in the settlement negotiations and that

11  EPA has absolute discretion to determine the terms of settlement.  EPA Br. at 7:22-26, 9:2-

12  18.  The *fact* that EPA excluded complainants from settlement discussions and kept those

13  proceedings and the Preliminary Finding secret demonstrates EPA's arbitrary and capricious

14  behavior while the language and structure of Title VI, as described above, shows that

15  Congress never gave EPA authority to undermine section 601 or the section 602

16  implementing regulations.

17          **B.      Section 603 of the Civil Rights Act Permits Judicial Review.**

18          Even though Title VI and EPA's regulations provide law to apply and thus allow

19  judicial review under *Chaney*, Congress specifically allowed for any aggrieved person to

20  seek judicial review when an agency makes a finding of noncompliance and chooses to

21  continue federal funding.  *See NAACP v. The Medical Center, Inc.*, 599 F.2d 1247, 1250 n.10

22  (3d Cir. 1979) (holding that section 603 provides "a right to seek judicial review of" the

23  Department of Health, Education, and Welfare's action to continue funding after the agency

24  found a recipient's noncompliance with Title VI and then obtained voluntary compliance, but

---

25  [7] EPA primarily argues that the Amended Complaint alleges that EPA violated the APA by

26  failing to make preliminary findings within 180 days of accepting the complaint.  EPA Br. at
    8:3-21 (*citing* Complaint ¶¶ 4, 46).  Garcia does not seek relief in this lawsuit for EPA's

27  unlawful delay.  Rather, the First Claim for Relief alleges that 40 C.F.R. § 7.115, and by
    implication section 602 of Title VI, require CDPR's substantive compliance with Title VI.

28  Complaint ¶¶ 87-88.

declining to decide whether plaintiffs were aggrieved persons and whether such action violated Title VI because the court remanded the matter for further proceedings).  Section 603 provides that:

> Any department or agency action taken pursuant to section 602, shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds.  In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 602, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with section 10 of the Administrative Procedure Act [5 U.S.C. §§ 701 et. seq.], and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that section.

42 U.S.C. § 2000d-2.

When interpreting this judicial review provision, this Court should follow the "cardinal canon" of statutory construction and "must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-254 (1992).  When statutory language is unambiguous, then "judicial inquiry is complete."  *Rubin v. United States*, 449 U.S. 424, 430 (1981).  Moreover, this Court should interpret section 603 broadly to effectuate the Civil Rights Act's remedial purpose.  *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 816 (9th Cir. 2002) (holding that Title VII's definition of "employee" does not prohibit counting the foreign employees of U.S.-controlled corporations for determining coverage).

The first sentence of section 603 dictates that judicial review of agency action should proceed under existing law.  *See Marlow v. U.S. Department of Education*, 820 F.2d 581, 582 (2d Cir. 1987).  Such existing law includes the APA, subject to the limitation on review of agency action committed to agency discretion by law.  *Id*. (citing 5 U.S.C. § 701(a)(2)).  For the reasons stated above in Section V.A, *supra*, Garcia may seek judicial review.

The second sentence makes reviewable certain actions regardless of whether such actions are committed to agency discretion by law.  Such circumstances include an agency "action . . . to continue financial assistance upon a finding of failure to comply with any

1  requirement imposed pursuant to section 602." 42 U.S.C. § 2000d-2.  Given that particular

2  type of action, "any person aggrieved" may obtain judicial review under the APA.  *Id.*  The

3  phrase "any person aggrieved" demonstrates Congressional intent to accord standing to the

4  fullest extent permitted by the case and controversy provision of Article III.  *See Trafficante*

5  *v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212 (1972) (holding that the term "aggrieved

6  person" in Title VIII of the Civil Rights Act afforded broad standing to all residents in a

7  housing unit "who are injured by racial discrimination").  Congress intentionally framed the

8  statutory language broadly, giving any person standing and not just a state or political

9  subdivision.[8]

10         EPA's Investigation Report and Preliminary Finding set forth EPA's factual and legal

11  conclusions in which EPA made a "finding of failure to comply with any requirement

12  imposed pursuant to section 602." 42 U.S.C. § 2000d-2.  Among those requirements EPA

13  imposed pursuant to section 602 is that "recipients of EPA assistance may not intentionally

14  discriminate or use criteria or methods of administering its program that have a

15  discriminatory effect based on race, color, or national origin."  Preliminary Finding at 2; *see*

16  *also* 40 C.F.R. § 7.35(b) (discriminatory effect prohibition).  EPA then found that CDPR's

17  conduct inflicted an "adverse disparate impact upon Latino schoolchildren in California from

18  the application of methyl bromide between 1995 and 2001."  Preliminary Finding at 3.

19         The fact that EPA framed the finding as "preliminary" matters not given the plain

20  meaning of section 603 and the structure of Title VI.  First, section 603 does not require the

21  finding of noncompliance to be final; rather Congress omitted such a qualification.  What

22  Congress *does not say* has equal weight when considering the plain meaning of a statute.

23  *Connecticut National Bank*, 503 U.S. at 254 (holding that permissive language in one section

24  and the omission of limiting language in another section demonstrated Congressional intent).

25

26  _____

[8] EPA does not contest Garcia's standing and the complaint alleges facts sufficient to
demonstrate standing.  Complaint ¶¶ 19-29; *Lujan v. Defenders of Wildlife*, 504 U.S. 555,
27  560-561 (1992).  The Court should thus hold that Garcia is an aggrieved person within the
expansive meaning of section 603.  Should the Court desire further argument with respect to
28  standing, Garcia would gladly submit a supplemental brief on that issue.

1    Second, the structure of Title VI indicates Congressional intent to allow judicial

2  review of an agency decision to allow continued funding after a finding of noncompliance.

3  In discerning Congressional intent, the Court should consider the structure as well as the text

4  of Title VI. *Sandoval*, 532 U.S. at 288 (interpreting the text and structure of Title VI to hold

5  that Congress did not intend to provide a private right of action to enforce regulations

6  promulgated pursuant to section 602).  Section 601 and EPA's regulations prohibit *any*

7  federally funded racial discrimination.  42 U.S.C. § 2000d; 40 C.F.R. § 7.35.  Section 602

8  expressly requires EPA to secure compliance through voluntary means before using other

9  authorized remedies, and EPA's implementing regulations accordingly require EPA to do so

10 through so-called "voluntary compliance agreements."  42 U.S.C. § 2000d-1; 40 C.F.R. §§

11 7.115(c), (d), (e), and (f).  Section 603 allows for judicial review of actions to continue

12 federal financial assistance.  *NAACP*, 599 F.2d at 1250 n.10.  Thus, Congress allowed for

13 judicial review here, notwithstanding agency discretion, because EPA found noncompliance,

14 executed a settlement agreement, and continued federal financial assistance to CDPR.

15    **C.    There are no other Adequate Remedies at Law.**

16    The Court should reject EPA's argument that a state administrative appeal process

17 before a County Agricultural Commissioner and CDPR provides an adequate remedy

18 sufficient to preclude judicial review.  First, section 603 expressly allows for judicial review

19 under the APA.  As described in Section V.B, *supra*, Congress authorized that "any person

20 aggrieved . . . may obtain judicial review of such action in accordance with section 10 of the"

21 APA, 5 U.S.C. §§ 701 *et seq*.  Congress sought to ensure judicial review in federal court

22 under the APA.  A state remedy before the same state political subdivision that EPA found

23 violated Title VI would defy Congressional intent to provide judicial review.

24    Second, the state administrative remedy EPA suggests is inadequate as a matter of

25 law.  The APA allows for judicial review of "final agency action for which there is no other

26 adequate remedy in a court."  5 U.S.C. § 704.   "When Congress enacted the APA to provide

27 a general authorization for review of agency action in the district courts, it did not intend that

28 general grant of jurisdiction to duplicate the previously established special statutory

procedures relating to specific agencies." *Bowen*, 487 U.S. at 903 (holding remedies in the Claims Court under the Tucker Act were inadequate remedies because the plaintiffs could not obtain injunctive relief). In order to preclude review, Congress must provide the duplicative remedies. Section 704 "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." *Id.* (quoting Attorney General's Manual on the Administrative Procedure Act 101 (1947)); *see also Brem-Air Disposal v Cohen*, 156 F.3d 1002, 1004 (9th Cir. 1998) (the inquiry is whether "Congress preclude[s] APA review by providing such an alternative remedy").[9] "The exception that was intended to avoid such duplication should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Id.* at 904.

EPA relies primarily on *Coker v. Sullivan*, 902 F.2d 84 (D.C. Cir. 1990), to argue the state law remedy is adequate and precludes judicial review. EPA Br. at 10. *Coker* is inapposite because the D.C. Circuit held that Congressionally mandated fair hearing procedures, combined with federal remedies under the Supremacy Clause and 42 U.S.C. § 1983 against the states, provided adequate remedies for the denial of Emergency Assistance benefits provided by the Aid to Families with Dependent Children. *Coker*, 902 F.2d at 89-90. In contrast, Congress did not mandate the *state* remedial procedures EPA suggests. Furthermore, and as EPA is well aware, Garcia and other similarly situated aggrieved persons have no private right of action to enforce EPA's disparate impact regulations on which EPA based its Preliminary Finding. *Sandoval*, 532 U.S. at 293; Investigation Report at 1 ("This assessment evaluates the potential for adverse disparate impacts due to exposure to agricultural MeBr use in California"). Thus, Congress did not authorize the claimed state remedy and Garcia also has no right of action against CDPR for the disparate impact Garcia suffers. *Id.*; Complaint ¶ 15.

Even if state law remedies could displace this Court's review under the APA, those remedies would not suffice. Here, Garcia seeks declaratory relief and injunctive relief

9

1   vacating the settlement and reopening the Title VI complaint, relief that would not be

2   available in the state court proceeding EPA suggests.  *See Bowen*, 487 U.S. at 904; *Tucson*

3   *Airport Authority v. General Dynamics Corp.,* 136 F.3d 641, 645 (9th Cir. 1998) (no

4   adequate remedy at Court of Federal Claims because it would not provide injunctive relief

5   sought by General Dynamics).  "The Supreme Court has repeatedly upheld an aggrieved

6   party's prompt access to the district court when it provides greater redress and broader

7   opportunity to develop a claim than is available in a more limited statutory scheme."  *Chang*

8   *v. USA*, 327 F.3d 911, 923 (9th Cir. 2003) (citing *Bowen*, 487 U.S. at 904).

9         Finally, EPA relies heavily on *Jacobs Farm/Del Cabo, Inc. v. Western Farm Service*

10  *Inc.*, 190 Cal.App.4th 1502 (Cal. Ct. App. 2010), but *Jacobs Farm* does not establish an

11  adequate remedy under the APA.  The plaintiff, an organic farming operation which suffered

12  crop loss when pesticides applied to nearby farms migrated to its crops, did not pursue legal

13  action against the County Agricultural Commissioner, the Department of Pesticide

14  Regulation, or any recipient of EPA funds.  Instead, the plaintiff prevailed in negligence,

15  trespass, and nuisance claims against Western Farm Service, Inc., the private entity that

16  applied the pesticides, and the appellate court affirmed.  *Jacobs Farm*, 190 Cal.App.4th at

17  1510-1511.   In *dicta*, the *Jacobs Farm* court suggests that the plaintiff could have challenged

18  the pesticide permits issued by the County Agricultural Commissioner through the process

19  set forth in California Food & Agricultural Code Section 14009.  *Id*. at 1520.

20        EPA offers an untenable solution in its motion to dismiss:  Garcia and any other

21  parent wishing to protect their child from harmful and discriminatory pesticide exposure

22  must challenge any and all permit applications every year their children attend school. [10]

23  _____

24  [10] EPA does not dispute standing, but attempts to reframe Garcia's injuries as only to
    Plaintiff Angelica Guzman's two children at Rio Lindo Elementary because only those

25  injuries are happening now and thus "certainly impending."  EPA Br. at 10 n.6 (citing
    *Clapper v. Amnesty International*, 133 S. Ct. 1138, 1143, 1147 (2013).  The Court should

26  reject this frozen, snapshot-in-time attempt to reduce the injury to fit EPA's adequate
    remedies argument.  First, the Complaint alleges procedural injuries beyond exposure to

27  pesticides and fumigants, including EPA's failure to evaluate exposure conditions subsequent
    to 2001 and beyond only methyl bromide.  Complaint ¶¶ 28-29.  Procedural injuries are

28  sufficient to confer standing.  *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009);

1   EPA makes no effort to demonstrate what number of annual permit challenges would be

2   necessary and what remedies would flow that would adequately replace the Title VI remedies

3   for racial discrimination, or the declaratory and injunctive relief available under the APA.

4   EPA Br. at 10-12.  Garcia would have to file multiple challenges each year until their

5   children graduate from Rio Mesa High School, a ridiculous proposition with an unclear

6   remedial outcome.  EPA inappropriately urges a state law administrative remedy that places

7   the burden on parents to protect their children when this Court may provide a remedies.

8   **VI.    EPA DEPRIVED GARCIA OF PROPERTY WITHOUT DUE PROCESS.**

9           Title VI and the California Constitution grant Garcia a right to live freely without

10  racial discrimination and a right to a public education.  The Court should deny the Motion for

11  three reasons.  First, Garcia directly benefits from Title VI through Congressionally

12  mandated protection from federally funded racial discrimination.  Second, Garcia has a

13  property interest in a right to redress under Title VI and EPA's regulations.  Third, EPA must

14  provide Garcia with a remedy for the discrimination EPA itself found because the harm

15  comes not from some independent third-party, but rather the state agency receiving EPA

16  funding with which EPA secretly negotiated a voluntary compliance agreement that imposes

17  no substantive protections.

18

19

20  _____

21  *Turtle Island Restoration Network v. United States Department of State*, 673 F.3d 914, 919
    (9th Cir. 2012).  Second, it is likely, and not conjectural or hypothetical, that the children will

22  not only attend elementary school, but progress on through and graduate from Rio Mesa
    High School, incurring injury all along the way.  Complaint ¶¶ 21-27.  EPA's strained view

23  of standing runs counter to fundamental standing decisions such as *Friends of the Earth v.
    Laidlaw*, which held that plaintiffs established standing based on their connection to, and use

24  of, the affected area and a reasonable fear of harm without the Court even considering
    whether the plaintiffs would move away or cease their injury through some kind of

25  interceding event subsequent to filing the complaint.  528 U.S. 167, 183-185 (2000).  The
    Supreme Court has never held that one suffering injury does not have standing because in the

26  future that injury may potentially cease, nor does EPA cite such authority.  It is also
    reasonably likely, and not hypothetical, that David Garcia's children will attend school at Rio

27  Lindo, Rio del Valle, and Rio Mesa based on where they live now.  Complaint ¶ 21; *Lujan v.
    Defenders of Wildlife*, 504 U.S. 555, 560, 566 (1992).

28

A.      EPA Directly and Adversely Affected Garcia's Property Interests.

EPA directly and adversely affected Garcia's constitutionally protected property interests by conducting an inadequate investigation, negotiation, settlement and resolution of *Angelita C.* that did not redress or prohibit racial discrimination.  EPA's actions deprived Garcia of entitlements to the right to redress racial discrimination and to a public school education.

By holding that victims of racial discrimination have no private right of action to enforce discriminatory effects regulations, the Supreme Court made federal agencies the sole enforcers of beneficiaries' rights to freedom from such discriminatory effects.  *Sandoval*, 532 U.S. at 281, 289.  EPA cannot argue they did not directly affect the plaintiffs' interests by failing to require CDPR stop its discrimination, when section 602 makes EPA responsible for enforcing its own regulations.  *See* 42 U.S.C. § 2000d-1

EPA relies on *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980), to argue that Garcia are indirect beneficiaries, EPA Br. at 14, but *O'Bannon* should not foreclose Garcia's due process claims for several reasons.  First, *O'Bannon* is inapposite because Garcia has legitimate property interests.  *See* Sections VI.B and VI.C, *infra*. Conversely, in *O'Bannon* the Court held that Medicare recipients had no property right to care in a qualified nursing home of their choice.  The Court found plaintiffs had "the right to continued benefits to pay for care in the *qualified* institution of his choice," and not "continued benefits to pay for care in an institution that has been determined to be *unqualified*." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 786 (1980) (emphasis added).  The plaintiffs challenge failed because the government actions indirectly and incidentally impinged on plaintiffs' specific entitlement to receive benefits at a *qualified* institution.  *Id*. at 786-789.

Here, Title VI provides a direct benefit to all persons by prohibiting EPA-funded discrimination.  "No person shall . . . be subjected to discrimination" at the hands of recipients of federal financial assistance.  42 U.S.C. § 2000d; *see also* 40 C.F.R. § 7.35(b) (discriminatory effect prohibition).  Congress did not qualify such protection and authorized

1  EPA to effectuate section 601 through regulations, which among other things, impose the

2  discriminatory effect prohibition.  42 U.S.C. § 2000d-1.  Nevertheless, EPA argues it

3  "regulates recipients – like the CDPR – not the individuals who may benefit from the use of

4  the financial assistance by the recipient," and their actions in resolving the *Angelita C.*

5  complaint were "directed against the CDPR, not plaintiffs" rendering any effect on plaintiffs

6  incidental.  EPA Br. at 14:20-25.  The Court should reject EPA's inappropriate attempt to

7  relegate victims of racial discrimination to incidental beneficiaries of a law designed to

8  protect them from the conduct of recipients of federal financial assistance.[11]

9       **B.    Garcia has a Property Interest in a Right to Redress.**

10        Title VI and EPA's regulations provide Garcia a property interest in a right to redress

11  CDPR's discriminatory conduct.  EPA attempts to distinguish *Logan v. Zimmerman*, 455

12  U.S. 422 (1982), by arguing that *Logan* "encompassed a private right of action" and that "this

13  case involves an 'enforcement action' controlled by the [EPA]."  EPA Br. at 15:11-16.

14  However, *Logan* extended the right to redress property interest from a private right of action

15  in court to include a state administrative adjudicatory process because the "claimant has more

16  than an abstract desire or interest in redressing his grievance: his right to redress is

17  guaranteed by the State, with the adequacy of his claim assessed under what is, in essence, a

18  'for cause' standard, based upon the substantiality of the evidence."  *Logan*, 455 U.S. at 431.

19  This administrative process differed substantially from the National Labor Relations Board

20  enforcement process which *Logan* identified in a footnote because the NLRB could refuse to

21  issue a complaint.  *Id.* at 431 n.6.

22        Title VI and EPA's regulations give Garcia a right to be free from racial

23  discrimination and provide a complainant a process to secure a remedy.  Unlike the NLRB,

24  EPA has no discretion to reject a timely Title VI complaint against an EPA recipient of

25  _____

26  [11] "Far from displaying congressional intent to create new rights, § 602 limits agencies to
    'effectuating' rights already created by § 601.  And the focus of § 602 is twice removed from
27  the individuals who will ultimately benefit from Title VI's protection.  Section 602 is yet a
    step further removed: it focuses neither on the individuals protected nor even on the funding
28  recipients being regulated, but on the agencies that will do the regulating."  *Sandoval*, 532
    U.S. at 288-289 (internal citations omitted).

1   federal financial assistance and must issue preliminary findings within 180 days of accepting

2   the complaint for investigation.  40 C.F.R. §§ 7.120 ("The OCR shall promptly investigate all

3   complaints filed under this section"); 40 C.F.R. § 7.120(g) (if no violation, OCR will dismiss

4   the complaint); 40 C.F.R. § 7.115(c)(1) (OCR has 180 days after accepting the complaint for

5   investigation to make a preliminary finding).  Because *Logan* held the right to redress

6   discrimination is a protected property interest and the Title VI complaint process does not

7   give EPA authority to ignore valid Title VI complaints, Garcia has a right to redress

8   discrimination, especially after EPA found discrimination in *Angelita C.*

9        EPA overreaches when arguing that *Town of Castle Rock v. Gonzales* should apply

10  beyond the Colorado statutory enforcement scheme for domestic violence restraining orders.

11  EPA Br. at 15:19-28.  While the Court held that the plaintiff did not have a property interest

12  in the enforcement of her restraining order by police, the Court explained its deeper review of

13  the Colorado statute's "sufficiently mandatory language" within the "deep-rooted nature of

14  law enforcement discretion" to which courts traditionally defer "even in the presence of

15  seemingly mandatory legislative commands."  *Town of Castle Rock v. Gonzales*, 545 U.S.

16  748, 761 (2005).  The Court emphasized the "common sense that all police officers must use

17  some discretion" and the "practical necessity for discretion in a case like this."  *Id.* (internal

18  citations omitted).  The specific question of entitlement to "someone else arrested for a

19  crime" by a police officer, *id* at 768, remains fundamentally different than the duty Congress

20  imposed on federal agencies to act such that no person shall endure federally financed

21  discrimination.  42 U.S.C. §§ 2000d, 2000d-1.

22       To support its argument that *Castle Rock* should apply here EPA *only* cites the

23  permissive term "may" in its regulation that allows EPA to terminate federal financial

24  assistance or use any other means authorized by law to secure compliance with Title VI.

25  EPA Br. at 16:10-14 (citing 40 C.F.R. § 7.130(a)).  EPA ignores the mandatory elements of

26  its regulations and Title VI itself which require EPA action, in sharp contrast to the Court's

27  holding in *Castle Rock*.  EPA "shall" first attempt to secure voluntary compliance before

28  resorting to other remedies.  42 U.S.C. § 2000d-1.  If the recipient fails to come into

1    voluntary compliance, EPA "shall" initiate the procedure to deny or rescind federal financial

2    assistance.  40 C.F.R. § 7.115(e); 40 C.F.R. § 7.130(b).  EPA also has authority to use any

3    other means required by law to secure compliance.  42 U.S.C. § 2000d-1; 40 C.F.R. §

4    7.130(a).  Beyond this remedial scheme and as argued in Section V.A, Title VI and EPA's

5    regulations do not provide EPA with discretion to continue federal financial assistance for

6    discrimination.

7           The Court should also reject EPA's claim of discretion to fund discrimination because

8    EPA ignores the statutory language of Title VI itself.   In *Goss v. Lopez*, the Supreme Court

9    held that plaintiffs had a property interest in a public education because Ohio state law

10   afforded a free education to all residents of appropriate age, regardless of the authority of

11   principals to suspend students for up to ten days.  419 U.S. 565, 573-574 (1975).  EPA

12   essentially makes the same failed argument the defendants made in *Goss*:  because EPA has

13   discretion under its regulations to determine the remedy, it has discretion to withhold the

14   property interest in a remedy.  Here, sections 601 and 602, and EPA's regulations, provide

15   that no person shall suffer racial discrimination, regardless of whether CDPR intends such

16   discrimination or whether discriminatory effects flow from its programs and policies.  42

17   U.S.C. §§ 2000d, 2000d-1; 40 C.F.R. 7.35(b).  EPA's regulations also require it to take

18   remedial action.  *See* 40 C.F.R. 7.115(e).  This Court should not conclude that EPA's

19   discretion to choose a remedy negates Garcia's entitlement to a remedy.

20          **C.    Title VI Requires EPA to Prevent Racial Discrimination.**

21          EPA directly and substantially impinges on Garcia's entitlement to a public school

22   education guaranteed by the California Constitution.[12]  Despite Title VI, EPA argues the

23   agency has no duty to protect plaintiffs from the racial discrimination EPA itself found

24   exists.  EPA Br. at 17:18-24.  Notably, EPA neither challenges Garcia's entitlement to an

25   education nor argues that exposure to unhealthy levels of pesticides do not deprive Garcia of

26   that property right.  Instead, EPA claims its failure to protect Garcia from exposure to

27   _____

28   [12] *See* Cal Const., art. IX § 1; Cal Const. art IX §5; *Serrano v. Priest*, 5 Cal.3d 584 (1971);
     *Butt v. State of California*, 4 Cal.4th 668 (1992).

1   pesticides does not deprive Garcia of property.  EPA Br. at 17:12-28 (citing *DeShaney v.*

2   *Winnebago County Department of Social Services*, 489 U.S. 189 (1989)).

3          The Supreme Court determines which state actions violate due process with a

4   "significance" test, holding any "significant taking of property by the State is within the

5   purview of the Due Process Clause."  *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972).  When

6   determining "significance" in the education context, the Supreme Court continually

7   recognizes the vital importance of students' interests in education.  *Goss*, 419 U.S. at 576.

8   "As long as a property deprivation is not *de minimis*, its gravity is irrelevant to the question

9   of whether account must be taken of the Due Process Clause."  *Goss*, 419 U.S. at 576

10  (holding that even suspension from public school for 10 days sufficient to trigger procedural

11  due process protections).  The Court explained the significance of a short suspension stating,

12  "education is perhaps the most important function of state and local governments" and

13  explaining the seriousness of the effects of suspension on the life of the suspended child.  *Id.*

14  (citing *Brown v. Board of Education*, 347 U.S. 483, 493 (1954)).

15         In this case, EPA's investigation, settlement, and dismissal of the *Angelita C.*

16  complaint directly jeopardizes the health, safety, and education of Latino schoolchildren in

17  California.  EPA's continued funding of CDPR and EPA's failure to effectuate Title VI,

18  allows children to experience unhealthy methyl bromide and other pesticide exposures at

19  school.[13]  Complaint ¶ 100.  The increased risk of disease and death in addition to the

20  induced reasonable fear of disease and death, which EPA itself found,[14] adversely affects

21  Latino schoolchildren's ability to fully participate in their education.  Complaint ¶ 100.

22  EPA's failure to protect and enforce the Garcias' rights under Title VI substantially impinges

23  on, and unfairly restricts their property interest in, a public education.

24         EPA incorrectly characterizes their inadequate resolution of the *Angelita C.* complaint

25  as an example of "the government's failure to prevent a third party from injuring plaintiffs"

26  found not to be a deprivation under the Due Process Clause in *DeShaney*.  EPA Br. at 17:12-

27  _____

28  [13] Preliminary Finding at 3.
    [14] Investigation Report at 73; Preliminary Finding at 3-4; Complaint ¶ 42.

15; *Deshaney*, 489 U.S. at 195. The EPA yet again denies Title VI and its own regulations which prohibit racial discrimination by those receiving federal financial assistance and EPA's obligation to remedy that discrimination. More importantly, EPA ignores the fact that Congress wanted EPA to regulate the conduct of recipients of federal financial assistance for the benefit of persons who may suffer racial discrimination. 42 U.S.C. § 2000d-1; *see also Sandoval*, 532 U.S. at 288-289 (Congress intended that federal agencies should effectuate Title VI). *DeShaney* is inapposite here because Congress specifically directed EPA to enforce Title VI. Accordingly, Garcia may appropriately challenge EPA's actions that deprived their property interest in public education without due process of law when EPA failed to ensure that Latino schoolchildren do not suffer unhealthy pesticide exposures at school.

## VII.    CONCLUSION.

For the reasons set forth above, the Court should deny the Motion to Dismiss.


Dated: December 11, 2013                Respectfully submitted,


/s/ Brent Newell
BRENT NEWELL
MADELINE STANO
CENTER ON RACE, POVERTY & THE ENVIRONMENT
47 Kearny Street, Suite 804
San Francisco, CA 94108
Telephone:      (415) 346-4179
Fax:            (415) 346-8723
Email:          bnewell@crpe-ej.org
                mstano@crpe-ej.org

MICHAEL MEUTER
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
Migrant Farmworker Project
3 Williams Road
Salinas, CA 93905
Telephone:      (831)757-5221
Facsimile:      (831)757-6212
Email:          mmeuter@crla.org

ANDRES GARCIA, CA Bar No. 235689
California Rural Legal Assistance, Inc.
338 South A Street
Oxnard, CA 93030
Telephone:     (805) 486.1068 ext. 113
Facsimile:      (805) 483.0535
Email:          agarcia@crla.org

VIRGINIA RUIZ, CA Bar No. 194986
FARMWORKER JUSTICE
1126 16th Street, N.W., Suite 270
Washington, DC 20036
Telephone:     (202) 293-5420
Facsimile:      (202) 293-5427
Email:          vruiz@farmworkerjustice.org

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on December 11, 2013, I electronically filed the foregoing with the

3   clerk of the Court using the CM/ECF System, which will send electronic notification of such

4   filing to all parties of record in the above-denoted matter.

5

6

7   Signed at San Francisco, California this 11th day of December, 2013.

8

9                                                /s/ Brent Newell
                                                 Brent Newell

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28