1

2

3              UNITED STATES DISTRICT COURT

4            NORTHERN DISTRICT OF CALIFORNIA

5

6    MARIA GARCIA, et al.,                    Case No. 13-cv-03939-WHO

                Plaintiffs,

7

8        v.                                   **ORDER GRANTING MOTION TO
                                              DISMISS**
9    GINA MCCARTHY, in her official capacity
     as Administrator of the U.S. Environmental   Re:  Dkt. No. 20
10   Protection Agency, et al.,

                Defendants.
11

12

13

14                        **INTRODUCTION**

15        Plaintiffs[1] Maria Garcia, David Garcia, and Angelica Guzman bring this action against

16   defendants Gina McCarthy, in her official capacity as Administrator of the United States

17   Environmental Protection Agency ("EPA"), Jared Blumenfeld, in his official capacity as Regional

     Administrator of Region IX of EPA, and EPA.  The plaintiffs allege violations of both the
18
     Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, and of their Due Process rights
19
     under the Fifth Amendment of the United States Constitution based on EPA's allegedly wrongful
20
     investigation, negotiation, and settlement of an administrative complaint.[2]  Based on the parties'
21
     briefs and argument of counsel, and for the reasons below, the defendants' motion to dismiss is
22
     GRANTED.
23

24

     _____
25
     [1] The plaintiffs occasionally refer to themselves as simply "Garcia" or the "Garcias," without any
26   apparent differentiation, in their pleading and motion papers.  For convenience, the Court will
     address all three defendants collectively and as "plaintiffs."
27   [2] EPA argues that the plaintiffs' third cause of action should be dismissed because an injunction is
     a remedy, not a cause of action.  Br. 18 (citing *Sullivan v. JP Morgan Chase Bank, NA*, 725 F.
     Supp. 2d 1087, 1099 (E.D. Cal. 2010)).  The plaintiffs state that they do not intend to assert the
28   "Third Claim for Relief" as a separate cause of action.  Opp'n 2 n.1.  Accordingly, there is no need
     to address it in this Order.

United States District Court
Northern District of California

**FACTUAL BACKGROUND**

The First Amended Complaint ("FAC") alleges the following:

On June 30, 1999, parents of Latino schoolchildren attending public schools, including plaintiff Maria Garcia, filed an administrative complaint with EPA on behalf of themselves and their children.  FAC ¶ 41.  The complaint in *Angelica C. v. California Department of Pesticide Regulation*, EPA File No. 16R-99-R9 ("*Angelita C.*"), alleged that the California Department of Pesticide Regulation ("CDPR") violated Title VI of the Civil Rights Act of 1964 ("Title VI") by subjecting Latino schoolchildren in California to harmful and discriminatory exposures to toxic pesticides and fumigants, in particular, methyl bromide.  FAC ¶ 41.  "To demonstrate this disproportionate impact, this complaint focus[ed] on methyl bromide, due to its particularly deadly characteristics, as an example of overall use of and exposure to highly toxic pesticides in the state."  FAC ¶ 41 (quoting *Angelita C.* at 2).  Exposure to high concentrations of methyl bromide can result in complete central nervous and respiratory system failure and cause severe harm to lungs, eyes, and skin.  FAC ¶ 42.  Chronic, low-level exposure is associated with peripheral neuropathies, impaired gait, cognitive and behavioral changes, and liver and kidney dysfunction.  FAC ¶ 42.  Acute effects from exposure include headaches, nausea, vomiting, seizures, psychosis, and death.  FAC ¶ 42.  Children are especially vulnerable to methyl bromide's effects.  FAC ¶ 42.

On December 11, 2001, EPA accepted the complaint for investigation, but did not make a preliminary finding within 180 days as required by 40 C.F.R. § 7.115(c).  FAC ¶¶ 3-4.  On September 10, 2002, EPA staff met exclusively with CDPR senior management, during which time CDPR "indicated its intent to continue authorizing the use of methyl bromide" and argued that its processes for issuing permits were adequate to address risks posed by the chemical.  FAC ¶ 44.  At some point, EPA conducted at least one additional phone call with CDPR senior management, during which time "CDPR reiterated its position that it was appropriately mitigating the risks posed by methyl bromide and in compliance with governing laws."  FAC ¶ 45.

Nearly 12 years after the filing of the complaint, on April 22, 2011, EPA issued a preliminary finding against CDPR of racial discrimination, concluding that Latino schoolchildren in California suffered excessive exposure to and disparate effects from methyl bromide between

2

1995 through 2001.  EPA concluded that there was "sufficient evidence to make a preliminary

finding of a *prima facie* violation of Title VI as a result of the disparate adverse impact upon

Latino schoolchildren in California from the application of methyl bromide between 1995 and

2001"; it did not analyze any other chemicals or any other time period after 2001.  FAC ¶ 47

(quoting Preliminary Finding 3).  Comparing data from over 8,000 "majority non-Latino"

California public schools against the schools listed in the complaint, EPA found that Latino

schoolchildren were disparately exposed to both short-term acute (two-to-30-day periods) and

long-term chronic (180-day period to lifetime) levels of methyl bromide above "EPA's health

thresholds of concern."  FAC ¶ 49.  Excessive levels were found at Rio Mesa High School, Rio del

Valle Middle School, and Rio Lindo Elementary School.  FAC ¶¶ 24, 27.

This was the first preliminary finding ever issued by EPA finding discrimination based on

race, color, or national origin.  FAC ¶ 6.  However, "EPA kept the preliminary finding secret" and

did not inform the complainants or the general public, nor were the complainants allowed to

discuss the investigation or view the investigative documents.  FAC ¶¶ 5, 52.  EPA requested that

CDPR maintain complete secrecy, stating, "OCR [(EPA's Office of Civil Rights)] would like to

conduct these discussions confidentially and hopes that CDPR will also view them in the same

way."  FAC ¶ 52.

Between August 22, 2011, and August 24, 2011, EPA and CDPR engaged in private

settlement discussions and did not invite the complainants to participate or to examine the

underlying documents for EPA's decision.  FAC ¶¶ 52-53.  On August 24, 2011, EPA entered into

an informal compliance agreement with CDPR pursuant to 40 C.F.R. § 7.115, but, again, the

complainants were not part of the process leading to the agreement.  FAC ¶ 7.  "As required by its

Title VI implementing regulations, EPA provided recommendations for CDPR to achieve

voluntary compliance with Title VI."  FAC ¶ 50.  Among other requirements, EPA recommended

more ongoing air monitoring through 2013; a data-call-in process with pesticide registrants to

collect data from high-use areas; promulgating methods to ensure that monitoring efforts are

effective against excessive long-term exposure; use of high-barrier virtually impermeable films

and township caps on methyl bromide levels; and holding three outreach events per year with the

Latino community.  FAC ¶¶ 50-51, 56.

The plaintiffs identify numerous deficiencies with the settlement agreement, asserting that it provides no relief to those exposed to the pesticides and leaves them without a remedy.  FAC ¶¶ 55, 57.  "The settlement does not limit or alter the current registration or the use of methyl bromide, its replacements, or other hazardous pesticides throughout California or within 1.5 miles of public schools.  CDPR last re-registered and certified as lawful the spraying of methyl bromide on January 26, 2012, for use in 2012.  CDPR has not indicated that registration or use faces any changes in 2013."  FAC ¶ 55.  The agreement contains no duty for CDPR to achieve the exposure reduction goals EPA recommended in its preliminary finding.  FAC ¶ 58.  "Rather, the settlement agreement allows CDPR to continue to discriminate against Latino children in California by allowing the hazardous application of methyl bromide and other dangerous pesticides and fumigants near their schools."  FAC ¶ 58.

EPA informed Brent Newell, the complainants' counsel, of the preliminary finding and agreement, and dismissed the complaint on the same day that the agreement was executed.  FAC ¶ 9.  Newell did not know of the preliminary finding, agreement, or dismissal before then.  FAC ¶ 59.  Ironically, Newell was attending an EPA-sponsored conference on Title VI and environmental justice, where EPA invited him to speak, when he was informed of the settlement.  FAC ¶ 59.  At the conference, Newell asked then-EPA Administrator Lisa P. Jackson to rescind the agreement, reopen negotiations with the complainants' participation, and remedy the discrimination identified in the preliminary finding.  FAC ¶ 60.  Shortly thereafter, Newell and other individuals met with Jackson to discuss his request.  FAC ¶ 61.

On January 9, 2012, Newell met with California Environmental Protection Agency ("California EPA") Secretary Matthew Rodriquez to discuss Newell's complaints.  FAC ¶ 62.  "Rodriquez indicated that California EPA was willing to meet with EPA and [Newell] to discuss whether to reopen the settlement agreement, as allowed by paragraph 23 of the agreement."  FAC ¶ 62.  On January 18, 2012, Newell and other environmental justice advocates met with Jackson to discuss reopening the agreement and including the complainants in any subsequent negotiations about *Angelita C.*, and mentioned that Rodriquez was willing to discuss doing so; "Jackson

1    unequivocally committed to contacting Secretary Rodriquez herself to discuss the matter."  FAC

2    ¶ 61.

3          In a February 24, 2012, letter from OCR Director DeLeon to Newell, DeLeon informed

4    Newell that EPA contacted Rodriquez, but Rodriquez said that Newell was not authorized to

5    represent that Rodriquez was willing to consider reopening the settlement."  FAC ¶ 64.  "Under

6    these circumstances," DeLeon wrote, "EPA does not intend to reopen the settlement agreement."

7    FAC ¶ 64.  Newell responded in a March 9, 2012, letter, which stated that "he believed

8    miscommunication between EPA and Rodriquez caused EPA to react" the way it did, and that

9    after speaking with Rodriquez, Rodriquez would send a separate letter to clarify EPA's

10   misunderstanding of his position.  FAC ¶ 65.  In a March 9, 2012, letter from Rodriquez to

11   DeLeon, Rodriquez stated that California EPA "would be willing to participate in discussions of

12   potential modifications to the settlement, especially if US EPA was interested in such

13   discussions."  FAC ¶ 66.  In addition, Rodriquez also stated that "[b]eyond the specific issues

14   involved in the *Angelita C.* settlement, we would be open to discussing the process used to resolve

15   any Title VI complaints in the future.  It is our sense that the process would be more credible if

16   complainants in these matters were provided with an opportunity to further explain the bases for

17   their claims before US EPA initiated settlement negotiations or other efforts to resolve a

18   complaint."  FAC ¶ 66.

19         On April 13, 2012, counsel for Garcia and other environmental justice advocates met

20   Administrator Jackson and senior EPA staff to discuss EPA's inadequate enforcement of Title VI

21   more broadly and as exemplified by the *Angelita C.* settlement agreement.  Deputy EPA

22   Administrator Bob Perciasepe stated that EPA would not reopen the settlement regardless of

23   Secretary Rodriquez's willingness to meet and consider reopening the settlement.  FAC ¶ 67.

24         According to the plaintiffs, "EPA has a longstanding history of failing to process Title VI

25   complaints in a timely manner."  FAC ¶ 68.  On October 14, 1996, 16 Title VI complainants sent a

26   letter to EPA Administrator to complain about EPA's failure to adhere to its regulatory deadlines

27   to process Title VI complaints—all 16 of those complaints failed to meet those deadlines.  FAC

28   ¶ 68.  In a December 9, 1996, response, the EPA Administrator recognized the problem and said

United States District Court
Northern District of California

that EPA had taken steps to address the concerns, including increasing staff and establishing a working group and task force to address the back lot of Title VI complaints.  FAC ¶ 69.  The problems seem to have persisted.

Between 2006 and 2007, EPA failed to process a single Title VI complaint in accordance with regulatory deadlines.  FAC ¶ 71 (citing *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1175 (9th Cir. 2009)).  A privately conducted report found that EPA complied with the 20-day period to accept, reject, or refer a complaint in only six percent of cases the report examined. FAC ¶ 72.  The report attributed the delays, in part, to a lack of standard operating procedures and supporting resources.  FAC ¶ 72.  In a court declaration, DeLeon proposed recommendations for reform and reported that the median time for deciding whether to accept a complaint is 118 days, and the median time for investigating and issuing decisions is 321.5 days, well over the 180-day deadline.  FAC ¶ 74.  An EPA chart showed that EPA complied with the 20-day "jurisdictional determination" in only two instances out of 136.  FAC ¶ 75.  A number of complaints have not been resolved years after they were accepted for investigation, including one dating back to 1994. FAC ¶ 75.

With regard to *Angelita C.*, the plaintiffs allege that EPA:  failed to determine whether exposure to methyl bromide and other toxic pesticides and fumigants resulted in a disparate adverse effect in violation of EPA's regulations implementing Title VI; failed to investigate whether the actual health consequences experienced; arbitrarily and capriciously executed the voluntary compliance agreement, which did not provide substantive protection against future actual and disparate adverse effects from the exposures; and arbitrarily and capriciously excluded the complainants from the investigation and settlement negotiations.  FAC ¶ 11.

Plaintiff Maria Garcia is the mother of plaintiffs David Marcia and Angelica Guzman. FAC ¶ 20.  David Garcia was 14 years old when *Angelita C.* was filed and a student at Rio Mesa High School in Oxnard, California.  David Garcia now has two children, one- and three-years old, that live in Oxnard in the Rio School District and Oxnard Union School District and will attend Rio Lindo Elementary School, Rio del Valle Middle School, and Rio Mesa High School.  FAC ¶ 21.  Plaintiff Guzman also lives in Oxnard and has two children, who live in the Rio School

United States District Court
Northern District of California

District and Oxnard Union School and will attend Rio del Valle Middle School and Rio Mesa High School in Oxnard, California.  FAC ¶ 22.  The plaintiffs are concerned that their children and grandchildren suffer or will suffer disparate adverse effects from exposure to methyl bromide, chloropicrin, or other pesticides and fumigants.  FAC ¶ 22.  David Garcia and Guzman both attended Rio Mesa High School, where "EPA's Exposure Assessment and Disparity Analysis" found that it "exceeded all twelve exposure scenarios by which EPA measured exceedances beyond federally established health-based standards."  FAC ¶ 24.

For the 2012-2013 school year, Rio Lindo Elementary School had a 91 percent Latino and 97.6 percent non-white student body.  FAC ¶ 25.  For the same year, Rio del Valle Middle School had an 82 percent Latino and 95 percent non-white student body.  FAC ¶ 26.

Compared to the rest of California, the three schools are among the top 10 percent of ZIP code areas with the highest environmental pollution, with 99.9 percent of the pollutants being pesticides.  FAC ¶ 78.  Use of soil fumigants in 2011 is still very high around Rio Mesa High School, and the area is in the 90th percentile of fumigant use in California.  FAC ¶ 79, Figure 2.

**PROCEDURAL BACKGROUND**

The plaintiffs filed this action on August 23, 2013.  Dkt. No. 1.  They filed the FAC on October 7, 2013.  Dkt. No. 10.  The plaintiffs bring the following causes of action:  (1) arbitrary and capricious agency action under 5 U.S.C. §§ 702 & 706(2)(A); (2) denial of procedural due process under the Fifth Amendment; and (3) injunctive relief.

The plaintiffs seek a declaration that EPA arbitrarily and capriciously settled and dismissed *Angelita C.* and seeks injunctive relief to vacate the agreement and dismissal.  FAC ¶ 12.  The plaintiffs also seek a declaration that EPA deprived them of property without due process of law and seeks injunctive relief to prevent EPA from continuing specific systemic practices and policies that deny the plaintiffs and similarly-situated complainants procedural due process, to require amendment of EPA's regulations to provide sufficient procedural protections, and to remedy the disparate adverse effects against Latino schoolchildren from exposure to methyl bromide and other fumigants.  FAC ¶ 14.

The plaintiffs argue that the Court has subject matter jurisdiction under 28 U.S.C. § 1331

because this action involves the United States as a defendant and arises under federal law, namely, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, and the Due Process Clause of the Fifth Amendment of the United States Constitution.  FAC ¶ 16.

On November 20, 2013, the defendants moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim.  Dkt. No. 20.  The plaintiffs filed an opposition brief, Dkt. No. 23, to which the defendants filed a reply, Dkt. No. 25.

## LEGAL STANDARD

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(1) if the court lacks subject matter jurisdiction.  FED. R. CIV. P. 12(b)(1).

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  The complaint "does not need detailed factual allegations," but instead only needs enough factual allegations "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "However, conclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss."  *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 834 (9th Cir. 2012).

## DISCUSSION

It is worth stating what this case and motion are and are not about at the outset of this discussion.  This case is not about whether EPA met the timeframes required by the regulations to investigate the plaintiffs' complaint (which is not to say that twelve years is an acceptable timeframe in which to resolve an administrative complaint, particularly since the regulations only provide for 180 days).  Nor is this motion about whether the Court may opine on the adequacy of the settlement or the wisdom of excluding the plaintiffs from the investigation and settlement of the case they started.  Rather, the Court is limited to the issue of what legal recourse the plaintiffs have against the EPA to force it to remedy the serious problems they allege.

The plaintiffs urge, in essence, that the broad anti-discriminatory purpose and language of

Title VI provide a basis for the Court to find that EPA's enforcement action and settlement with CDPR are not within its complete discretion, despite *Heckler v. Chaney*, 470 U.S. 821 (1985), and its progeny.  While the facts, as alleged, point to serious problems that the EPA could have addressed more meaningfully, the law does not allow the Court to wade into this dispute.

## I.      TITLE VI AND EPA'S IMPLEMENTING REGULATIONS

Title VI of the Civil Rights Act of 1964 prohibits a recipient of federal funds from discriminating based on race, color, or national origin.  42 U.S.C. § 2000d.  Congress authorized federal agencies to issue rules, regulations, and orders of general applicability to ensure compliance with Title VI and to terminate federal funding for non-compliance.  42 U.S.C. § 2000d-1.  Pursuant to Title VI, EPA promulgated regulations prohibiting discrimination and established an administrative complaint process to enforce Title VI's prohibitions.  The regulations, along with the APA, provide the parameters within which the Court can review EPA's actions.

EPA's regulations implementing Title VI state, "No person shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving EPA assistance on the basis of race, color, national origin, or on the basis of sex . . . ."  40 C.F.R. § 7.30.  "EPA's Administrator, Director of the Office of Civil Rights, [ ] and other responsible officials shall seek the cooperation of applicants and recipients[3] in securing compliance . . . ."  40 C.F.R. § 7.105.  "A person who believes that he or she or a specific class of persons has been discriminated against in violation of this part may file a complaint [with EPA]."  40 C.F.R. § 7.120(a).  Within 20 days of receiving a complaint, "the OCR will review the complaint for acceptance, rejection, or referral to the appropriate Federal agency."  40 C.F.R. § 7.120(d)(1)(i).  If the complaint is accepted, OCR must notify the complainant and the accused party.  40 C.F.R. §7.120(d)(1)(ii).  The recipient has 30 days to respond to the complaint.  40 C.F.R. § 7.120(d)(1)(iii).  "OCR shall attempt to resolve complaints informally whenever possible.  When a complaint cannot be resolved informally, OCR shall follow the [following] procedures."

---

[3] "Recipients" refers to the recipients of federal funding subject to Title VI.  In this case, the recipient is CDPR.

United States District Court
Northern District of California

40 C.F.R. §§ 7.120(d)(2)(i).

Within 180 days of the start of the investigation, "the OCR will notify the recipient . . . of: (i) Preliminary findings; (ii) Recommendations, if any, for achieving voluntary compliance; and (iii) Recipient's right to engage in voluntary compliance negotiations where appropriate." 40 C.F.R. § 7.115(c). The agency must first determine whether compliance can be "secured by voluntary means" before taking other steps. 42 U.S.C. § 2000d-1. All voluntary compliance agreements must be in writing and explain the specific steps agreed to. 40 C.F.R. § 7.115(f). EPA regulations do not provide for participation by third parties in the voluntary compliance negotiations. Br. 3 (citing 40 C.F.R. §§ 7.115, 7.120).

Once EPA finishes its initial investigation, it must send the preliminary findings to the recipient, who may either agree to OCR's recommendations, explain why the findings are incorrect, or describe how compliance may be achieved through steps other than those recommended by OCR. 40 C.F.R. § 7.115(d). If the recipient does not take one of these actions within 50 days of receiving the preliminary findings, the OCR must issue a formal written determination of noncompliance to the recipient and notify the Assistant Attorney General for the United States Department of Justice's Civil Rights Division within 14 days thereafter. 40 C.F.R. §§ 7.115(d), 7.25. "The recipient will have ten (10) calendar days from receipt of the formal determination of noncompliance in which to come into voluntary compliance. If the recipient fails to meet this deadline, the OCR must start proceedings" to "deny, annul, suspend or terminate EPA assistance." 40 C.F.R. §§ 7.115(e), 7.130(b).

While proceedings must be initiated, cutting off funding is not mandatory: "If compliance . . . cannot be assured by informal means, EPA *may* terminate or refuse to award or to continue assistance. EPA *may* also use any other means authorized by law to get compliance . . . ." 40 C.F.R. § 7.130(a) (emphasis added). By implication, cutting off EPA finding only occurs after a formal written determination of noncompliance. *See* 40 C.F.R. § 7.115(e). The recipient has the opportunity to appeal OCR's formal determination to the Chief Administrative Law Judge ("ALJ") of the EPA, and then to appeal the ALJ's determination to the EPA Administrator. 40 C.F.R. §§ 7.130(b)(2) & (3).

Any agency actions under these laws "shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds.  In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d-1 of this title, any person aggrieved . . . may obtain judicial review of such action in accordance with [the APA], and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that chapter."  42 U.S.C. § 2000d-2.

Title VI and the regulations discussed above apply here because EPA provides financial assistance to the CDPR, which "regulates the manufacture, distribution, sale, and use of pesticides in California."  Br. 2 (quoting *Californians for Alternatives to Toxics v. Calif. Dep't of Pesticide Regulation*, 136 Cal. App. 4th 1049, 1055 (Ct. App. 2006)).

## II.     FIRST CAUSE OF ACTION:  VIOLATION OF THE APA

The plaintiffs allege four problems with EPA's actions:  (1) it limited its investigation to methyl bromide exposure only, and only from 1995 to 2001; (2) it did not inform the complainants about the negotiations and agreement, and did not include them in the process; (3) the settlement does not require CDPR's compliance with Title VI as required by 40 C.F.R. § 7.115; and (4) the settlement does not remedy the disparate adverse effects of methyl bromide and other pesticide exposures to Latino schoolchildren.  FAC ¶¶ 87, 88.

EPA responds that none of those problems is justiciable.  It asserts that its decision to settle the complaint through voluntary compliance is committed to its discretion and the Court lacks jurisdiction to review it except to determine if EPA exceeded its statutory or regulatory authority. Because it did not exceed its regulatory, statutory, or constitutional authority, EPA argues that its actions were within the bounds of the law.  Br. 4.  In addition, EPA argues that the Court lacks jurisdiction over the plaintiffs' APA claim because they have another adequate remedy in court—a state court suit challenging the issuance of permits to use pesticides near schools.  Br. 1.

### A.  EPA's Action Was Committed To Its Discretion.

Federal law provides for judicial review of agency actions except where "agency action is

committed to agency discretion by law." 5 U.S.C. § 701.  This exception applies "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  But even where the substance or result of a decision is committed fully to an agency's discretion, "a federal court has jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion involves violation by the agency of constitutional, statutory, regulatory or other legal mandates or restrictions." *Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967, 976 (9th Cir. 2013) (citation omitted).  "In such circumstances, a federal court lacks only jurisdiction to review an alleged abuse of discretion regarding 'the making of an informed judgment by the agency.'" *Id.* at 976-77.  "[F]inal agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.  A court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

Where an agency is "authorized" to perform some action, but not required to do so, a court "may review only whether the [agency] followed whatever legal restrictions applied to [its] decision-making process." *Drakes Bay*, 729 F.3d at 977.  Words like "may" in laws or regulations suggest that an agency has discretion. *See Ass'n of Irritated Residents v. E.P.A.*, 494 F.3d 1027, 1032-33 (D.C. Cir. 2007).  "Even where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion." *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003) (citation and quotation marks omitted).

The Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831.  This presumption exists because "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise" and "the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular

United States District Court
Northern District of California

1    enforcement action requested best fits the agency's overall policies, and, indeed, whether the

2    agency has enough resources to undertake the action at all." *Id.* at 831.

3           However, "the decision is only presumptively unreviewable; the presumption may be

4    rebutted where the substantive statute has provided guidelines for the agency to follow in

5    exercising its enforcement powers." *Id.* at 832-33. The Court must then see if Congress has

6    provided "law to apply." "If [Congress] has indicated an intent to circumscribe agency

7    enforcement discretion, and has provided meaningful standards for defining the limits of that

8    discretion, there is 'law to apply' under § 701(a)(2), and courts may require that the agency follow

9    that law; if it has not, then an agency refusal to institute proceedings is a decision 'committed to

10   agency discretion by law' within the meaning of that section." *Id.* at 834-35.

11          Courts have held that the government's decision to settle a case is within its discretion and

12   subject to the *Chaney* presumption. *See, e.g.*, *Ass'n of Irritated Residents*, 494 F.3d at 1031

13   ("Although the Supreme Court's decision in *Chaney* applies directly to agency decisions not to

14   enforce a statute, we have also applied it to an agency's decision to settle an enforcement

15   action."); *Baltimore Gas & Elec. Co. v. F.E.R.C.*, 252 F.3d 456, 457 (D.C. Cir. 2001); *see also*

16   *United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008) (concluding that decision to

17   settle is within agency discretion but not applying *Chaney* presumption).

18          The plaintiffs challenge EPA's enforcement actions (or alleged lack thereof). They

19   recognize that while the *Chaney* presumption has been extended to settlement agreements

20   executed by an agency, "[a] plaintiff may [ ] rebut the *Chaney* presumption when the substantive

21   statute or an agency's regulations provide law for the Court to apply." Opp'n 11 (citing *Chaney*,

22   470 U.S. at 932-33; *Greater L.A. Council on Deafness, Inc. v. Baldridge*, 827 F.2d 1353, 1361

23   (9th Cir. 1987)). As discussed above, an agency's decision whether to enforce or not enforce a

24   statute, or to settle a case, is generally within its discretion and therefore unreviewable. The most

25   that the Court may do is assess whether EPA followed the procedures set out in the regulations for

26   investigating complaints. The Court is not persuaded, however, that EPA violated those

27   procedures in any way, nor have the plaintiffs sufficiently pointed to any examples of EPA doing

28   so.

United States District Court
Northern District of California

1    Consider the four problems alleged by plaintiffs.  First, the plaintiffs argue that EPA

2   wrongfully limited its investigation to methyl bromide exposure only, and only from 1995 to

3   2001.  FAC ¶ 87.  But while the law provides the plaintiffs the right to file a complaint with EPA,

4   nowhere does it give them the right to define the scope of EPA's investigation, nor does it

5   mandate what EPA must investigate.  Upon receiving and reviewing a complaint, EPA may

6   accept, reject, or refer the complaint to another agency.  40 C.F.R. § 7.120(d)(1)(i).  The law does

7   not set out any criteria EPA must use to accept, reject, or refer; the decision about what to do with

8   a complaint appears committed to agency discretion.  Having discretion to determine whether to

9   accept or reject a complaint for investigation necessarily entails discretion to determine the subject

10   matter and extent of an investigation.  The plaintiffs say that EPA should not have limited its

11   investigation to methyl bromide exposure from 1995 to 2001 only as opposed to other chemicals

12   and other time periods, but they do not dispute that EPA could have rejected their complaint

13   altogether.  But there is also no requirement that in investigating the allegations in a complaint

14   EPA's investigation must be of the same scope as the complaint.  The scope of EPA's

15   investigation is within its discretion and therefore is unreviewable.

16    Second, the plaintiffs complain that EPA did not inform the complainants about the

17   negotiations and settlement agreement, and did not include them in the process.  FAC ¶ 87.  They

18   argue that the very fact that EPA excluded the complainants from settlement discussions

19   constitutes arbitrary and capricious behavior.  Opp'n 13.  But there is no requirement that EPA

20   inform or include the complainants during settlement.  After a complainant files a complaint, if it

21   is accepted, OCR must notify the complainant of the acceptance and the accused party of the

22   allegations.  40 C.F.R. §7.120(d)(1)(ii).  Beyond notice of receipt, acceptance, and dismissal of a

23   complaint, the law does not require EPA to provide the complainant with any other notice or to

24   include the complainant in any process.  The plaintiffs concede that they received these notices.

25   Given the fact that the regulations *do* contain multiple notice provisions for other events, the

26   drafters of the regulations could have included a notice requirement for the complainant about the

27   negotiations or settlement if the drafters wanted to.  They did not.  The plaintiffs appear to suggest

28   that EPA should have used them as a source of information and that excluding them from the

1    investigative process was incorrect.  EPA's decision might have been imprudent, but the law does

2    not specify what sources of information EPA must rely upon in its investigation.  While EPA must

3    make "findings," and elsewhere the regulations have record-keeping requirements for funding

4    recipients, the regulations do not dictate where EPA must look in forming its conclusions or how

5    EPA must make those determinations.  *See generally* 40 C.F.R. §§ 7.85, 7.115.  These decisions

6    are committed to the agency's discretion, and EPA did not act improperly.

7             The third and fourth problems may be discussed together.  The plaintiffs assert that the

8    settlement wrongfully fails to require CDPR's compliance with Title VI as required by 40 C.F.R.

9    § 7.115 and does not remedy the disparate adverse effects of methyl bromide and other pesticide

10   exposures to Latino schoolchildren.  FAC ¶¶ 87, 88.  The Court assumes for purposes of this

11   motion that the plaintiffs' allegations are true.  Even so, as discussed earlier, and as the plaintiffs

12   concede, courts have held that the decision to settle and the terms of the settlement are within an

13   agency's enforcement discretion.  *See, e.g.*, *Ass'n of Irritated Residents*, 494 F.3d at 1031;

14   *Baltimore Gas & Elec.*, 252 F.3d at 457; *see also Carpenter*, 526 F.3d at 1241-42.

15            This conclusion is further bolstered by the fact that while the regulations say that EPA

16   must seek "compliance," that term is undefined.  The law is silent about what constitutes

17   compliance and what sort of settlement is adequate, if one is sought.  There is no standard by

18   which the Court may decide those questions. The "General Prohibition" laid out in Title VI's

19   implementing regulations simply states that "[n]o person shall be excluded from participation in,

20   be denied the benefits of, or be subjected to discrimination under any program or activity receiving

21   EPA assistance on the basis of race, color, national origin, or on the basis of sex . . . ."  40 C.F.R.

22   § 7.30.  The regulations then only speak generally of "securing compliance" and provide

23   procedures for EPA to do so, but nowhere does Title VI or its regulations explain what constitutes

24   "compliance" or what the criteria are for determining whether an individual was wrongfully

25   "excluded" or "subjected to discrimination."  *See, e.g.*, 40 C.F.R. § 7.105.  The laws are "drawn so

26   that a court would have no meaningful standard against which to judge the agency's exercise of

27   discretion."  *Chaney*, 470 U.S. at 830.  Therefore, EPA's actions in this case are not subject to

28   judicial review because they fall within the exception of "agency action [that] is committed to

15

agency discretion by law."  5 U.S.C. § 701.

In addition, the adequacy of a settlement and compliance necessarily bleeds into the issue of the scope of an investigation, which, as discussed earlier, is also committed to EPA's discretion:  what constitutes compliance depends upon the breadth and content of what EPA was investigating.  The terms of a settlement are within EPA's discretion and therefore are unreviewable, and the plaintiffs have not shown any arbitrary and capricious action, an abuse of discretion, or action contrary to law.  In none of the areas about which the plaintiffs complain do they identify the "law to apply."

The plaintiffs nonetheless argue that 42 U.S.C. § 2000d-2 "specifically allows for judicial review given EPA's finding of discrimination and decision to continue funding CDPR without protecting Garcia and other similarly situated parents and children."  Opp'n 10-11.  The plaintiffs assert that 42 U.S.C. § 2000d and 40 C.F.R. § 7.35(b) "limit EPA's enforcement discretion to continue funding CDPR after finding methyl bromide use inflicted disparate adverse effects and ignoring the discriminatory effects of the fumigants replacing methyl bromide."  Opp'n 11-12. Because EPA is required to first secure compliance using voluntary compliance agreements before mandating other remedies, the plaintiffs contend that 42 U.S.C. § 2000d-1 and 40 C.F.R. § 7.115 "together limit EPA's enforcement discretion by requiring EPA to actually ensure compliance with Title VI in a voluntary compliance agreement before resorting to other remedies required in 40 C.F.R. § 7.130(a) and (b)."  Opp'n 12 (citing *Adams v. Richardson*, 480 F.2d 1159, 1161-63 (D.C. Cir. 1973)[4]).  The Court may therefore use Title VI and EPA's regulations to review EPA's investigation and settlement to determine whether it acted arbitrarily, capriciously, or not in accordance with the law.  Opp'n 12.

EPA replies that it did precisely what the law requires:  attempt to resolve an

---

[4] At the hearing on the motion, the plaintiffs argued that *Adams*—a case they cite once, but do not discuss, in their briefs—should control here.  *Adams* held that a district court could review the decision of an agency that "consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty."  480 F.2d at 1162.  That is factually distinct from this case, where EPA did investigate the complaint, made preliminary findings, and secured a settlement.  In any event, the plaintiffs acknowledge that *Adams*, a D.C. Circuit decision, predates *Chaney*, a Supreme Court decision.  To the extent *Adams* is factually similar, it does not control.

16

United States District Court
Northern District of California

administrative enforcement action through a voluntary compliance agreement. Reply 3. The laws only dictate a procedure; they do not constrain EPA's enforcement discretion. EPA, not the plaintiffs or the Court, has the discretion to determine whether CDPR's promised actions were sufficient. Reply 4 (citing *Schering Corp. v. Heckler*, 779 F.2d 683, 687 (D.C. Cir. 1985); *Ass'n of Irritated Residents*, 494 F.3d at 1031-33, 1034-35). For the reasons discussed earlier, the Court agrees with EPA.

The plaintiffs argue that the Court "should interpret [42 U.S.C. § 2000d-2] broadly to effectuate the Civil Rights Act's remedial purpose." Opp'n 14. "The first sentence of [42 U.S.C. § 2000d-2] dictates that judicial review of agency action should proceed under existing law." Opp'n 14 (citing *Marlow v. U.S. Dep't of Educ.*, 820 F.2d 581, 582 (2d Cir. 1987)). "Such existing law includes the APA, subject to the limitation on review of agency action committed to agency discretion by law." *Id.* The plaintiffs then argue that the second sentence of 42 U.S.C. § 2000d-2 makes EPA's actions reviewable because the statement that "any aggrieved person" may obtain judicial review "demonstrates Congressional intent to accord standing to the fullest extent permitted." Opp'n 14-15. The plaintiffs say that the fact that EPA's findings were preliminary does not matter because the statute "does not require the finding of noncompliance to be final; rather Congress omitted such a qualification." Opp'n 15.

Finally, the plaintiffs argue that judicial review is available even though EPA allowed continued funding after a finding of noncompliance. Opp'n 16. They premise their argument on "the structure of Title VI." "[42 U.S.C. § 2000d-2] allows for judicial review of actions to continue federal financial assistance." Opp'n 16. "Thus, Congress allowed for judicial review, notwithstanding agency discretion, because EPA found noncompliance, executed a settlement agreement, and continued federal financial assistance to CDPR." Opp'n 16.

The plaintiffs are incorrect. 42 U.S.C. § 2000d-2 explicitly states that judicial review is available "as may otherwise be provided by law for similar action taken by such department or agency on other grounds" or "[i]n the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section"—in the latter circumstance, review is not available if funding continues. As discussed

1   above, the law does not provide for judicial review.

2      At the hearing on the motion, the plaintiffs argue that EPA's understanding of 42 U.S.C.

3   § 2000d-1, renders either "terminating" or "refusing . . . to continue" redundant, thereby violating

4   the "cardinal rule of statutory interpretation that no provision should be construed to be entirely

5   redundant." *Spencer Enters.*, 345 F.3d at 691.  The Court rejects the plaintiffs' interpretation.

6   The most natural reading of the statute is that "refusing" modifies both "grant" and "continue."

7   First, the phrase "refusing to grant or continue" is separated from the rest of the provision by

8   commas, suggesting it is an independent clause, with "refusing" modifying both "grant" and

9   "continue."  Second, the identical simple present tenses of "grant" and "continue" suggest that

10  they are modified by "refusing to"; to read "continue" as being independent, as the plaintiffs wish

11  the Court to do, would result in an ungrammatical sentence that essentially reads, "in the case of

12  any action terminating . . . or continue[ ] assistance . . . ."  The verb tenses would not be parallel.

13  EPA's interpretation is also consistent with 40 C.F.R. § 7.130(a), which states that "If compliance

14  with this part cannot be assured by informal means, EPA may terminate or refuse to award or to

15  continue assistance."

16      The Court concludes that EPA's actions in negotiating, settling, and dismissing *Angelita C.*

17  were committed to its discretion and that the Court is precluded from reviewing it.  5 U.S.C.

18  § 701(a)(2).  Title VI's regulations were drawn in such a way that the Court has no meaningful

19  standard against which to judge EPA's actions.  Under *Chaney*, that means that such actions are

20  committed to EPA's discretion.  *Chaney*, 470 U.S. at 830.  Even if EPA's actions were

21  reviewable, the Court finds that EPA did not act in a manner that was "arbitrary, capricious, an

22  abuse of discretion, or otherwise not in accordance with law."[5]  5 U.S.C. § 706.

23      **B.  The Plaintiffs Have An Alternative Adequate Remedy.**

24      Even if the plaintiffs were correct that EPA's actions were not wholly discretionary, the

25  Court still lacks the authority to address the merits because the plaintiffs have an alternative

26

27  _____
    [5] The FAC makes numerous references to the fact that EPA appears to have exceeded the time
28  limits prescribed in the regulations.  The plaintiffs state that they are not challenging any delay on
    EPA's part.  Opp'n 13 n.7.

United States District Court
Northern District of California

adequate remedy.  The APA states, "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  The APA premises jurisdiction on the absence of an adequate alternative remedy in court.  5 U.S.C. §§ 702, 704.  "[D]oubtful and limited relief . . . is not [ ] adequate."  *Bowen v. Mass.*, 487 U.S. 879, 901 (1988).  However, "a statutory remedy specifically against the discriminating entity [can be] 'adequate,' and therefore preclusive of a default remedy under the APA."  *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 750-51 (D.C. Cir. 1990)  "[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'"  *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009).  "Suits directly against the discriminating entities may be more arduous, and less effective in providing systemic relief, than continuing judicial oversight of federal government enforcement.  But under our precedent, situation-specific litigation affords an adequate, even if imperfect, remedy."  *Women's Equity Action League*, 906 F.2d at 751.

"An alternative remedy is adequate if it would remedy the injury about which the plaintiff complains."  Br. 10 (citing *Coker v. Sullivan*, 902 F.2d 84, 90 n.5 (D.C. Cir. 1990)).  EPA argues that the "Plaintiffs have an adequate alternative remedy, namely, state law action challenging the Ventura County Agricultural Commissioner's decision to award permits for the use of methyl bromide and other pesticides to farms in proximity to the elementary school attended by plaintiff Angelica Guzman's two children."  Br. 10; Reply 6 (citing *Jacobs Farm/Del Cabo, Inc. v. Western Farm Servs., Inc.*, 119 Cal. Rptr. 3d 529, 541 (Ct. App. 2010); CAL. FOOD AND AGRIC. CODE § 14009; CAL. CODE CIV. P. § 1094.5).  This remedy is adequate, EPA claims, because it would allow plaintiffs to remedy the injury about which they claim, i.e., the exposure to methyl bromide and other pesticides.  Br. 10.

In this regard, EPA notes that the remedy need not affect the challenged agency action to be adequate.  *Id.*  "[C]ourts have routinely concluded that the APA precludes suits against the federal government because the plaintiff can sue the recipient directly."  Br. 11 (citing *Stimac v. Barr*, 10 F.3d 808 (9th Cir. 1993) (unpublished); *Vilsack*, 563 F.3d at 522-23 ("[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the

1    'same genre.'") (citation omitted); *Women's Equity Action League*, 906 F.2d at 745; *Preskar v.*

2    *United States*, 248 F.R.D. 576, 584 (E.D. Cal. 2008)).  Because California regulates pesticides

3    such as methyl bromide and requires permits for their use, and because California law permits any

4    interested person to challenge in court the grant of a permit, EPA contends that the plaintiffs have

5    an adequate remedy to alleviate the injury of which they complain.  Br. 11-12.

6         The plaintiffs make two arguments in response.  First, citing *Bowen v. Massachusetts*, 487

7    U.S. at 903, they assert that Congress must be the one that provides the remedies to preclude

8    review under the APA, and Congress did not provide a remedy here.  Opp'n 11.  Second, they

9    complain that the proposed remedy is inadequate.  Neither argument is persuasive.

10        The plaintiffs assert that EPA's reliance on *Coker v. Sullivan*, 902 F.2d 84 (D.C. Cir.

11   1990), to argue that a state law remedy is adequate and precludes judicial review is misplaced

12   because there, Congress specifically mandated state remedial procedures, whereas it did not here.

13   Opp'n 17.  "Furthermore, and as EPA is well aware, Garcia and other similarly situated aggrieved

14   persons have no private right of action to enforce EPA's disparate impact regulations on which

15   EPA based its Preliminary Finding."  Opp'n 17.  The plaintiffs say that since Congress did not

16   authorize the claimed state remedy, Garcia has no right of action against CDPR.

17        EPA rejects the plaintiffs' arguments.  EPA distinguishes *Bowen* since it only "held that a

18   suit for damages in the Court of Claims was not an adequate remedy" because it "does not have

19   the general equitable powers of a district court to grant prospective relief," but *Bowen* "did not

20   address the adequacy of remedies created by state law."  Reply 7 (citing *Ariz. Christian Sch.*

21   *Tuition Org. v. Winn*, 131 S. Ct. 1436, 1448-49 (2011); *United States v. L.A. Tucker Truck Lines,*

22   *Inc.*, 334 U.S. 33, 37-38 (1952)).  EPA also asserts that *Coker* is squarely on point because among

23   the remedies found to be adequate alternatives in *Coker* were state administrative hearings that

24   could result in state judicial review, which is what EPA argues is adequate here.

25        EPA has the better argument.  While EPA concedes that there is no case expressly stating

26   that a remedy not provided by Congress can be "adequate," the Court is persuaded that the text of

27   the statute, which only requires an "adequate remedy in *a* court," is broad enough to encompass

28   state remedies.  If Congress wanted to be more specific, it could have been.  The APA states that

United States District Court
Northern District of California

20

1    judicial review of agency actions is available in "a court of the United States," 5 U.S.C. § 702, but

2    it does not place such a limitation in § 704.  The Court will not impute one.

3           Second, the plaintiffs argue that the state remedies identified by EPA are inadequate

4    because the plaintiffs cannot obtain the same remedies that are available under the APA and "must

5    challenge multiple permits to apply restricted use pesticides every year their children attend"

6    school.  Opp'n 11.  They seek declaratory and injunctive relief vacating the settlement, which

7    would not be available in state court proceedings.  Opp'n 17-18 (citing *Tucson Airport Auth. V.*

8    *Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998)).  "The Supreme Court has repeatedly

9    upheld an aggrieved party's prompt access to the district court when it provides greater redress

10   and broader opportunity to develop a claim than is available in a more limited statutory scheme."

11   *Chang v. United States*, 327 F.3d 911, 923 (9th Cir. 2003).  The plaintiffs dispute EPA's reliance

12   on *Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.*, 190 Cal. App. 4th 1502 (Ct. App.

13   2010), which allowed negligence, trespass, and nuisance claims based on the defendant's use of

14   pesticides that harmed the plaintiff's adjacent lands.  In dicta, the court suggested that the plaintiff

15   could have challenged the pesticide permits issued by the state commissioner.  But here, "Garcia

16   would have to file multiple challenges each year until their children graduate . . . ."  Opp'n 19.

17          EPA responds that the issue "is not whether the proposed remedy would undo the agency's

18   action, but whether, if successful, it would alleviate the injury about which the plaintiff

19   complains."  Reply 7 (citing *Coker*, 902 F.2d at 90 n.5).  EPA says the proposed remedy would

20   alleviate the plaintiffs' alleged injuries by reducing pesticide exposure.  In addition, EPA argues

21   that it cannot, through a Title VI action, force CDPR to implement more stringent pesticide

22   requirements.  Reply 8.  EPA could cut off funding to CDPR, but doing so would not change the

23   state's requirements; on the other hand, the proposed alternative remedy would allow the plaintiffs

24   to directly curb pesticide exposure.  Reply 8.  The fact that the plaintiffs may need to file multiple

25   challenges does not render the remedy inadequate, according to EPA.  Reply 8 (citing *Council of*

26   *& for the Blind of Delaware Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532 (D.C. Cir. 1983)

27   ("Even if we agreed that one nationwide suit would be more effective than several [ ] suits, that

28   does not mean that the remedy provided by Congress is *inadequate*.")).  The existence of this

1    alternative remedy eliminates the Court's jurisdiction over the plaintiffs' APA claims.

2         Although the plaintiffs conclude that they have an *inadequate* remedy, they are essentially

3    arguing that they cannot get the *same* remedy as here. *See* Opp'n 17-18 ("Here, Garcia seeks

4    declaratory and injunctive relief vacating the settlement and reopening the Title VI complaint,

5    relief that would not be available in the state court proceeding EPA suggests."). But "the

6    alternative remedy need not provide relief identical to relief under the APA, so long as it offers

7    relief of the 'same genre.'" *Vilsack*, 563 F.3d at 522. Nor must the alternative remedy affect the

8    challenged agency or its actions. So long as the injury is redressable through other recourse, the

9    APA bars judicial review. *Coker*, 902 F.2d at 90 n.5.

10        The Court finds this to be a close question but concludes that the alternative remedy

11   proposed by EPA, while quite different than what plaintiffs hope for, is adequate. California law

12   governs and restricts the use of pesticides. CAL. FOOD AND AGRIC. CODE § 14001. As the

13   California Court of Appeals noted, "It is an understatement to say that the use of pesticides in

14   California is highly regulated." *Jacobs Farm*, 119 Cal. Rptr. 3d at 538. Methyl bromide, in

15   particular, is explicitly regulated. CAL. FOOD AND AGRIC. CODE §§ 14081, 14082. Any use of

16   pesticides for agricultural purposes must be conducted pursuant to a permit granted by the state.

17   CAL. FOOD AND AGRIC. CODE § 14006.5. In establishing the permitting process, the CDPR must

18   consider the "[d]anger of impairment of public health." CAL. FOOD AND AGRIC. CODE §

19   14004.5(a). Granted permits are generally effective for one year. CAL. FOOD AND AGRIC. CODE §

20   14007. Receiving a permit "does not relieve any person from liability for any damage to the

21   person or property of another person which is caused by the use of any restricted material." CAL.

22   FOOD AND AGRIC. CODE § 14001. "Before issuing a permit for any pesticide the [CDPR-licensed]

23   commissioner shall consider local conditions including . . . [u]se in vicinity of schools." CAL.

24   FOOD AND AGRIC. CODE § 14006.5(a).

25        The regulations provide for review by the commissioner, CDPR, and the state courts.

26   "Any interested person may request the commissioner to review his or her action in issuing,

27   refusing, revoking, suspending, or conditioning a permit to use or possess a restricted material.

28   The commissioner shall review the request and issue a written decision in response to the request

United States District Court
Northern District of California

22

to review within 10 days of receipt of the request, or as soon as practicable.  The commissioner

may affirm, modify, or cancel the permit action reviewed.  A directly affected person may

thereafter appeal to the director to review the commissioner's action."  CAL. FOOD AND AGRIC.

CODE § 14009; *see also* CAL. FOOD AND AGRIC. CODE § 14025.  Judicial review of any such

decision by the commissioner is available.  CAL. FOOD AND AGRIC. CODE § 14009(g).  The

reviewing court may issue an order setting aside any grant of a permit.  CAL. CODE CIV. P.

§ 1094.5(f).

    Although the Court is unaware of any challenges under these provisions, and the parties

have pointed the Court to none, the Court is persuaded that California law provides a different but

adequate remedy to address the harm about which the plaintiffs complain.  The California Court of

Appeals has recognized the procedure described, and it would provide direct relief to the plaintiffs

if they prevailed.  Under the Title VI procedure, EPA can cut off funding to CDPR, but it cannot

force the CDPR to alter the state's pesticides requirements.  *See Council of & for the Blind of Del.*

*Cnty. Valley*, 709 F.2d 1521, 1532 (D.C. Cir. 1983) ("although [the agency] could seek voluntary

compliance, [it] could not order the local government to stop the discrimination").  By pursuing

the available state remedies of challenging the issuance of permits, the plaintiffs would have

control over their case and could achieve more direct relief than EPA could offer (if it was so

inclined).

    The plaintiffs correctly note that the one case cited by EPA as an example of an adequate

state remedy, *Jacobs Farm*, 119 Cal. Rptr. 3d 529, did not involve legal action against the state.

There, the California Court of Appeals affirmed a jury verdict finding a defendant liable for

negligence, trespass, and nuisance because pesticides that the defendant used on nearby fields

migrated to the plaintiff's organic farm and damaged its crops.  Even though *Jacobs Farm* was not

an action challenging the issuance of a permit, the plaintiffs recognize that the "court suggests that

the plaintiff [in *Jacobs Farm*] could have challenged the pesticide permits issued by the County

Agricultural Commissioner through the process set forth in California Food & Agricultural Code

1   Section 14009."  Opp'n 18 (citing *Jacobs Farm*, 190 Cal. App. 4th at 1520).[6]

2        The plaintiffs assert that challenging permits is not feasible, however, because they "would

3   have to file multiple challenges each year . . . a ridiculous proposition with an unclear remedial

4   outcome."  Opp'n 19.  But the fact that the alternative remedy "may be more arduous, and less

5   effective in providing systemic relief" does not make it inadequate.  *Women's Equity Action*

6   *League*, 906 F.2d at 751.  For the reasons stated, it is not at all clear to the Court that challenges

7   through the state process would be less effective than what the plaintiffs want the EPA to do in

8   this action, let alone that they would be ineffective.  Leaving that aside, beyond arguing that the

9   alternative remedy would require much time and effort, the plaintiffs never argue that California

10  law is actually ineffective.  As the Supreme Court has said, "Actions directly against the states are

11  not merely adequate; they are also more suitable avenues for plaintiffs to pursue the relief they

12  seek . . . . [if t]he states are the immediate cause of the injuries of which the [plaintiffs]

13  complain . . . ."  *Coker*, 902 F.2d at 90.  The presence of adequate remedies afforded by state law

14  prevents the Court from reviewing EPA's actions.

15       Because the enforcement action and settlement were within the discretion of EPA, and, as

16  an independent basis, plaintiffs have an adequate alternative remedy at law, the Court concludes

17  that it lacks jurisdiction to consider the plaintiffs' APA claim.[7]

18  **III.    SECOND CAUSE OF ACTION: VIOLATION OF DUE PROCESS**

19       The plaintiffs allege that EPA's actions violated their Fifth Amendment Due Process rights

20  in two ways.  First, EPA deprived them of a property right to a remedy for discrimination by

21  entering into a settlement agreement that failed to protect against the disparate adverse effects

22  EPA found.  FAC ¶ 98.  Second, EPA deprived the plaintiffs' children of their property right in a

23

24  _____

    [6] In addition, *Jacobs Farm* makes clear that tort remedies are available against the alleged
25  pesticide users.
    [7] EPA also argues that the plaintiffs lack standing to seek relief for alleged future injury that their
26  children—who are between the ages of one and five— may experience in middle or high school
    because the harm is too speculative given that a number of intervening events could occur such
27  that the plaintiffs cannot assert that the injury is "certainly impending."  Br. 10. n.6.  The only
    injury that could be asserted is for exposure at Rio Lindo Elementary School, where Guzman's
28  children currently attend.  The plaintiffs dispute this.  Opp'n 18-19 n.10.  Given the Court's
    conclusion, there is no need to address the standing issue here.

United States District Court
Northern District of California

public education by continuing to fund the CDPR and by entering into an agreement that does not protect them against exposure to methyl bromide and other pesticides.[8]  FAC ¶ 100.

EPA argues that the plaintiffs' Due Process claim fails because (1) EPA did not act against them; (2) they lack a cognizable property right to redress; and (3) EPA did not deprive anyone of a public education.  Br. 1.

A person claiming a deprivation of property without due process must have had a property right in the thing of which the person was allegedly deprived.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).  "[P]roperty interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72 (1972).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."  *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (quotation marks omitted); *id.* at 576.  "Such entitlements are . . . not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Id.*; *Loudermill*, 470 U.S. at 538.  But not every governmental action that detrimentally affects a protected property interest constitutes a deprivation because "the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action." *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 789 (1980)).  Governmental "action that is directed against a third party and affects the citizen only indirectly or incidentally" does not amount to an unconstitutional deprivation.  *Id.* at 788.

### A.  EPA's Actions Did Not Deprive The Plaintiffs Of An Alleged Right to Redress.

The plaintiffs argue that "EPA directly and adversely affected Garcia's constitutionally protected property interests by conducting an inadequate investigation, negotiation, settlement and resolution of *Angelita C.* that did not redress or prohibit racial discrimination.  EPA's actions deprived Garcia of entitlements to the right to redress racial discrimination . . . ."  Opp'n 20.

---

[8] For purposes of this discussion, the Court assumes, without deciding, that the plaintiffs have standing to seek relief for their children.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Because Congress made federal agencies the sole enforcer of beneficiaries' rights to freedom from

2    discrimination, EPA's failure to require the CDPR to stop its discrimination directly affects the

3    plaintiffs' interests.  Opp'n 20.

4         A cognizable property interest is a necessary element of a wrongful deprivation claim.

5    *Loudermill*, 470 U.S. at 538.  However, the plaintiffs provide no authority demonstrating that they

6    have the property interest they claim.  Nothing in Title VI's regulations explicitly (or implicitly)

7    creates such a right, and no case says that they do.  At the hearing on this motion, the plaintiffs

8    conceded that they know of no case recognizing such a right.  The Court concludes that the

9    plaintiffs fail to state a claim for deprivation without due process of a "constitutionally-protected

10   property interest in their right to redress from racially discriminatory effects prohibited by EPA's

11   regulations implementing Title VI."  FAC ¶ 97.

12        While the plaintiffs cite *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 431 (1982), for the

13   proposition that "[t]he Supreme Court has specifically held that the 'right to redress'

14   discrimination prohibited by statu[t]e is a protected due process right," Opp'n 25, the plaintiffs'

15   characterization of that case is both incorrect and inapplicable here because the *Logan* plaintiff

16   was explicitly granted a cause of action through state law.  That is not true here, where Title VI's

17   implementing regulations give federal agencies the authority to enforce Title VI but do not afford

18   individuals the right to sue federal funding recipients; at most, they may seek judicial review of

19   agency action.  As the plaintiffs correctly recognize, "the Supreme Court made federal agencies

20   the sole enforcers of beneficiaries' rights to freedom from [ ] discriminatory effects," Opp'n 20

21   (citing *Alexander v. Sandoval*, 532 U.S. 275, 281, 289 (2001)), and precluded implying a private

22   cause of action under 42 U.S.C. § 2000d-1.  Indeed, the Supreme Court in *Logan* specifically

23   distinguished situations in which an individual's "right to redress [to redress discrimination] is

24   guaranteed by the State" from situations in which the law entrusts "enforcement action[s]" to

25   government agencies, like the National Labor Relations Board, and the "refusal to issue a

26   complaint is generally not reviewable . . . by the courts."  455 U.S. at 431 & n.6.  Similarly, while

27   the EPA must "*review* [each] complaint for acceptance, rejection, or referral," it has discretion not

28   to accept a complaint and initiate an investigation.  40 C.F.R. § 7.120(d)(1)(i).

United States District Court
Northern District of California

1    Little in Title VI's regulations indicates an intention to create an entitlement to "redress."

2 The plaintiffs are not even guaranteed that any complaint they submit to EPA will be accepted. 42

3 U.S.C. § 2000d-1 only speaks of ways in which agencies "may" effect compliance, as well as "any

4 other means authorized by law"—this is strong evidence that Congress intended agencies to retain

5 broad discretion to enforce Title VI. *See also* 40 C.F.R. § 7.130(a). Moreover, as the Supreme

6 Court has stated, "Our cases recognize that a benefit is not a protected entitlement if government

7 officials may grant or deny it in their discretion." *Town of Castle Rock*, 545 U.S. at 756. The fact

8 that the plaintiffs may be the ultimate beneficiaries of regulations enacted pursuant to 42 U.S.C.

9 § 2000d-1 does not mean that they have a property interest in the benefits conferred (if cutting off

10 funding to a third party may even be characterized as a "benefit"). As EPA observes, "[I]f

11 Congress or EPA had intended to create an entitlement to redress for [the plaintiffs], then one

12 would expect the statute and regulation to provide for complainants' inclusion in the enforcement

13 process after the filing of an administrative complaint," as well as more robust requirements for

14 EPA, but they did not. Reply 13.

15    EPA argues that *Town of Castle Rock*, 545 U.S. 748, also shows that the plaintiffs have no

16 cognizable property interest. In that case, the female plaintiff asserted a property interest in police

17 enforcement of a restraining order she had against her husband; the Supreme Court ruled that she

18 did not have one. Where the order stated that the police must "use every reasonable means, up to

19 and including arrest, to enforce the order's terms," the Court found that "[s]uch indeterminacy is

20 not the hallmark of a duty that is mandatory" and that no one "can be safely deemed 'entitled' to

21 something when the identity of the alleged entitlement is vague." *Id.* at 763. Here, EPA's

22 regulations only state that it "may" seek compliance but is not obligated to do so. Br. 16 (citing 40

23 C.F.R. § 7.130). The use of the term "may" signifies that EPA has discretion, not an obligation, to

24 act. Br. 16 (citing *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 347 (2005)).

25 EPA argues that "the content of the supposed entitlement is too vague to establish a mandatory

26 duty," and the plaintiffs do not explain what "redress" would be adequate. Br. 16; Reply 12.

27 *Town of Castle Rock* requires something less vague to confer a property interest. Br. 17.

28    The plaintiffs contend that *Town of Castle Rock* is inapplicable because police officers are

27

1    afforded more discretion than federal agencies in protecting against discrimination. EPA's

2    citation to the permissive term "may" ignores the law's mandate that EPA "shall" first attempt to

3    secure voluntary compliance before implementing other remedies. Opp'n 22 (citing 42 U.S.C.

4    § 2000d-1). Then it "shall" initiate procedures to deny or rescind federal funding. Opp'n 23

5    (citing 40 C.F.R. § 7.115(e); 40 C.F.R. § 7.130(b)). Otherwise, "Title VI and EPA's regulations

6    do not provide EPA with discretion to continue federal financial assistance for discrimination."

7    Opp'n 23.

8          The principles stated in *Town of Castle Rock* are applicable outside the criminal context.

9    The Ninth Circuit applied *Town of Castle Rock* to claims seeking an entitlement to benefits in

10   *Doyle v. City of Medford*, 606 F.3d 667, 674-75 (9th Cir. 2010). Further, despite the fact that the

11   laws cited by the plaintiffs state "shall," they do not dictate any substantive outcome. Indeed,

12   EPA must only terminate funding after a formal determination of noncompliance, which has not

13   occurred here. Reply 11 (citing 40 C.F.R. §§ 7.115(e), 7.130(b)). The Ninth Circuit has also

14   reminded that "[p]articularly when used in a statute that prospectively affects government action,

15   'shall' is sometimes the equivalent of 'may.'" *Sierra Club v. Whitman*, 268 F.3d 898, 904 (9th

16   Cir. 2001). In any event, 40 C.F.R. § 7.130(a) states that an agency "may" terminate funding if

17   voluntary compliance does not occur, not "shall" or "must." Reply 11-12.

18         The Court agrees with EPA's reading of *Town of Castle Rock*. The laws at issue here are

19   too "indeterminate" and "vague" to create an entitlement for the plaintiffs. Where the language is

20   clear, it shows that EPA is given broad discretion to investigate and resolve alleged violations by

21   federal funding recipients. To be sure, *Town of Castle Rock* is not wholly on point because the

22   plaintiff there is not the ultimate beneficiary of any law, whereas the plaintiffs here are the

23   ultimate beneficiaries of Title VI's regulations. 545 U.S. at 764-66. However, that does not create

24   a property interest deriving from 42 U.S.C. § 2000d-1 and regulations passed pursuant to it. The

25   plaintiffs are entitled to no more than the statute and regulations say, and they only say that the

26   plaintiffs may file a complaint with EPA if they are aggrieved, nothing more. The Supreme Court

27   even casts doubt on that as a property right, saying that "an entitlement to nothing but procedure

28   [is something] we have held inadequate even to support standing." *Id.* at 764. Though the APA

United States District Court
Northern District of California

28

affords the plaintiffs an opportunity to seek judicial review of agency action, as explained above the limited circumstances in which judicial review is available are not present here.

The plaintiffs argue that *Goss v. Lopez*, 419 U.S. 565, 573-74 (1975), contradicts EPA's argument that "because EPA has discretion under its regulations to determine the remedy, it has discretion to withhold the property interest in a remedy." Opp'n 23. EPA argues that *Goss* does not apply. EPA is correct. *Goss* holds that a property interest in education, once given, cannot be taken away without due process; here, EPA's point "is that no property interest in redress has been created." Reply 12.

In addition to failing to show a cognizable property interest, the plaintiffs fail to show a "deprivation." The plaintiffs have a right to file a complaint with EPA, but the regulations do not provide them with any further rights except for notification that their complaint was received, accepted, or dismissed. 40 C.F.R. §§ 7.120(c), (d)(1)(ii), (g). The plaintiffs fail to allege what they had or were owed by EPA, but which EPA did not give or wrongfully took from them, other than a right to redress. And that, standing alone, is not a property right.

**B. EPA's Actions Did Not Deprive The Plaintiffs Of An Alleged Right To Education.**

The plaintiffs assert that "[b]y continuing to fund CDPR and failing to require CDPR to take any meaningful action to decrease or mitigate the effects of the use of dangerous pesticides and fumigants near majority Latino public schools . . . EPA denies Latino schoolchildren the full benefits of public schooling, and substantially impinges on their property interest in a public education." FAC ¶ 100.

The plaintiffs fail to state a claim for deprivation without due process of their right to education. The parties do not dispute that the plaintiffs have a protected interest in education. The problem for the plaintiffs, however, is that they fail to show any "deprivation" of that protected interest by EPA. EPA does not compel the plaintiffs' attendance at school, nor does it apply the pesticides complained of. The essence of the plaintiffs' argument is that EPA's allegedly failed to protect the plaintiffs from exposure, but that does not amount to a "deprivation" of due process. To the extent that EPA's settlement with the CDPR has some relation to the alleged exposure, the causation is too indirect and attenuated to be actionable as a constitutional "deprivation."

1    *O'Bannon*, 447 U.S. at 788-90.

2         EPA argues that *O'Bannon v. Town Court Nursing Center* controls here and forecloses

3    plaintiffs' claim because governmental action that is directed at a third party that may have an

4    indirect effect on the plaintiffs is insufficient to state a claim.  In *O'Bannon*, the Supreme Court

5    held that the Department of Health, Education, and Welfare's revocation of a nursing facility's

6    certification as a skilled nursing facility, which made it eligible to receive payments from the

7    Department for providing nursing care services to aged, disabled, and poor persons, did not

8    constitute a deprivation of an alleged right of the residents to continue living in the home of their

9    choice.  447 U.S. at 785.  While the Court recognized that the residents had certain government-

10   conferred benefits, the agency action at issue was against a third party (the residence) and the

11   residents were therefore affected only "indirectly or incidentally," which does not amount to a

12   constitutional "deprivation."  *Id.* at 788-90.

13        Similarly, EPA regulates the CDPR, not the plaintiffs.  Accordingly, the plaintiffs were

14   only "indirectly" affected by EPA's actions.  Br. 14 (citing *Castaneda v. U.S.D.A.*, 807 F.2d 1478,

15   1479-80 (9th Cir. 1987)).  EPA concludes that because any harm the plaintiffs experienced was

16   "indirect and incidental," it does not amount to a deprivation of life, liberty, or property.[9]  Br. 12

17   (quoting *O'Bannon*, 447 U.S. at 787); Reply 9.

18        The plaintiffs argue that EPA's reliance on *O'Bannon* is wrong because in that case,

19   Medicare recipients had no property right to be in the nursing home of their choice.  "Here, Title

20   VI provides a direct benefit to all persons by prohibiting EPA-funded discrimination" because the

21   law provides that "No person shall . . . be subjected to discrimination."  Opp'n 20 (quoting 42

22   U.S.C. § 2000d).  EPA is therefore wrong to argue that it regulates federal funding recipients, such

23   as CDPR, but that the victims of racial discrimination are merely incidental beneficiaries.  Opp'n

24   21.

25

26

27   ───────────────
     [9] In its briefs, EPA advanced this argument with regard to both the plaintiffs' asserted right to
28   redress and right to education.  At the hearing, however, EPA stated that it will only advance this
     argument with regard to the plaintiffs' right to education.

United States District Court
Northern District of California

1 EPA says that the plaintiffs in *O'Bannon* articulated two different due process claims, and

2 the Supreme Court rejected one based on the absence of a property right. 447 U.S. at 785-86.

3 However, EPA relies on the Supreme Court's rejection of the second theory because someone who

4 is "only indirectly or incidentally" affected by government action does not suffer a due process

5 deprivation. Reply 9 (citing 447 U.S. at 788). "The existence of a property interest does not, by

6 itself, establish a violation of the Due Process Clause. A plaintiff must also establish that the

7 government's conduct rises to the level of a [deprivation]." Reply 9-10. *O'Bannon* explicitly

8 states there is a "distinction between government action that directly affects a citizen's legal rights,

9 or imposes a direct restraint on his liberty, and action that is directed against a third party and

10 affects the citizen only indirectly or incidentally . . . ." 447 U.S. at 789; *see also Castaneda v.*

11 *U.S.D.A.*, 807 F.2d 1478, 1479-80 (9th Cir. 1987)[10]; *Ridder v. Office of Thrift Supervision*, 146

12 F.3d 1035, 1041 (D.C. Cir. 1998). Here, EPA's action was directed at CDPR, and any negative

13 effect experienced by the plaintiffs is indirect, meaning that there is no due process deprivation.

14 Reply 10.

15 The Court agrees with EPA's reading of *O'Bannon*. Whatever entitlement the *O'Bannon*

16 plaintiffs had was only incidentally burdened by the Department's actions against their nursing

17 home. Similarly, whatever effect EPA's settlement had on the plaintiffs is also "indirect" and

18 "incidental." The alleged entitlement here is of a weightier nature than the inconvenience suffered

19 by the plaintiffs in *O'Bannon*. But to the extent the plaintiffs' right to education was affected by

20 EPA's actions, the Court concludes that any "deprivation" was only indirect and incidental to

21 EPA's exercise of its discretion in negotiating and settling *Angelita C.* and not actionable.

22 The plaintiffs argue that "EPA directly and substantially impinges on Garcia's entitlement

23 to a public school education guaranteed by the California Constitution." Opp'n 23. Any taking of

---

[10] In *Castaneda*, 807 F.2d at 1479-80, the Ninth Circuit affirmed the principle in *O'Bannon*. There, the plaintiff was terminated from his job as a store manager after the Department of Agriculture revoked his store's enrollment in the federal food stamp program upon learning that the plaintiff was using food stamps to purchase beer and other ineligible items. The plaintiff then sued the Department for deprivation of due process. Although the court pointed out that the plaintiff had no property interest in his private employment, it also explained that he "was only an indirect beneficiary of the government's statutory relationship" and "is not a direct target of the government's disqualification decision." Therefore he had no due process rights.

United States District Court
Northern District of California

property which is "significant" violates due process, and EPA's deprivation of the schoolchildren's right to education is significant.  Opp'n 24 (citing *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972); *Goss*, 419 U.S. at 576).  Here, EPA itself found that the exposure to methyl bromide "adversely affects Latino schoolchildren's ability to fully participate in their education."  Opp'n 24 (citing FAC ¶ 100).  "EPA's failure to protect and enforce the Garcias' rights under Title VI substantially impinges on, and unfairly restricts their property interest in, a public education."  Opp'n 24.

The plaintiffs correctly cite *Fuentes* for the proposition that "[a]ny significant taking of property by the State is within the purview of the Due Process Clause."  *Fuentes*, 407 U.S. 86. But the plaintiffs put the cart before the horse because they do not adequately plead any "taking" by EPA, let alone a significant one.  Calling the investigation, negotiation, and settlement between EPA and CDPR a "deprivation" or "taking" seriously strains the ordinary understanding of those terms.  The plaintiffs point to no cases in which conduct analogous to EPA's actions here amount to a deprivation.  EPA has an obligation to follow the dictates of Title VI and its implementing regulations, but as explained earlier, EPA has done so and has acted within its discretion.  The Court cannot disturb its decisions even if the Court thought that other alternatives would have been preferable.

For all the reasons above, the Court concludes that the plaintiffs fail to state a claim for violation of their Due Process rights.

**CONCLUSION**

The Court sympathizes with the plaintiffs and others similarly situated if the allegations in the FAC are true.  However, the Court is bound to apply the law as it stands.  The Court lacks jurisdiction to consider the plaintiffs' APA cause of action.  Further amendment would be futile, so EPA's motion to dismiss the First Cause of Action is GRANTED WITH PREJUDICE.  The plaintiffs also fail to state a claim for violation of their Due Process rights, and the Court is skeptical that further pleading can rectify its defects.  However, in the event the plaintiffs wish to amend, they may do so within 20 days of this Order.  The Court GRANTS WITH LEAVE TO AMEND EPA's motion to dismiss the Second Cause of Action.  In the event no amended

United States District Court
Northern District of California

32

1   complaint is filed within that time period, this case will be dismissed and judgment entered in

2   favor of EPA.

3       **IT IS SO ORDERED.**

4   Dated:  January 16, 2014



WILLIAM H. ORRICK
United States District Judge